Ray Harroun v. Commissioner.
Harroun v. Commissioner
Docket No. 5869.
United States Tax Court
1945 Tax Ct. Memo LEXIS 117; 4 T.C.M. (CCH) 780; T.C.M. (RIA) 45252; July 20, 1945
Douglas D. Felix, Esq., Congress Bldg., Miami, Fla., for the petitioner. F. L. Van Haaften, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner made several adjustments to the net income disclosed by petitioner's *118 return for the calendar year 1941 and determined a deficiency in income tax in the amount of $6,354.85. Some of the adjustments are not contested. The pleadings, as amended, raise several issues, stated by the parties upon brief as presenting the following questions: I. Did petitioner make an effective transfer to his wife of an undivided one-third interest in his undivided one-half interest in an invention and patent rights thereon? In other words, was all of the income from this source properly included by respondent in petitioner's gross income? II. Is income received by petitioner from lessees of a patent, designated as royalties, taxable as earned income within the meaning of the Internal Revenue Code? III. What portion, if any, of the amount of $720 paid as rent of an apartment in Saginaw, Michigan, may be deducted as an ordinary and necessary business expense? IV. How much depreciation may be deducted from gross income on boats owned by petitioner? V. How much depreciation and other expense may be allowed upon an automobile used by petitioner in connection with his business? VI. What is the aggregate amount which may be deducted for hotel bills, meals, tips and *119 entertainment as ordinary and necessary expenses of carrying on petitioner's business? and VII. How much depreciation may be allowed on machinery owned by petitioner and leased to a manufacturing corporation? General Findings of Fact Petitioner's return of income for the year 1941, on the cash basis, was filed with the collector of internal revenue for the district of Michigan and the tax shown to be due was paid. During the taxable year he maintained a yeararound residence at the Belcrest Hotel in Detroit. Michigan, but actually lived there only approximately three months. Substantially equal portions of his time were spent at Pine Lake, Michigan, Saginaw, Michigan, and Miami Beach, Florida. He maintained homes at Pine Lake and Miami Beach and rented an apartment at Saginaw. Petitioner's principal occupation or profession is engineering. During a substantial part of his adult life he has worked at automotive engineering and has secured several patents. In more recent years he has continued his experiments and has carried on some promotion work, devoted largely to disposing of patents and rights to use them. Most of the income received during the taxable year was derived from *120 that source. The business carried on by petitioner took him about the country some. He owned two automobiles, one of which was used in connection with his business. The adjustments giving rise to the issues other than the second one are shown in the following schedule: Issue I.
Income from Royalties.
Included in gross income of wife
$9,903.33
Less Adjustment not in issue
560.40
Royalty Income Added
$9,342.93
Issue III.
Rent, Saginaw Apt. Deducted in Return
360.00
Allowed
180.00
Disallowed
180.00
Issue IV.
Depreciation claimed on Boats
600.00
Allowed
300.00
Disallowed
300.00
Issue V.
(a) Depreciation claimed on Auto
400.00
Allowed
200.00
Disallowed
200.00
(b) Automobile expense claimed
450.00
Allowed
225.00
Disallowed
225.00
Issue VI.
Hotel Bills, Meals, Entertainment, etc., claimed
850.00
Allowed
425.00
Disallowed
425.00
Issue VII.
Depreciation claimed on machinery
2,003.67
Allowed
447.85
Disallowed
1,555.82
Issue II involves the computation of petitioner's earned income credit, the details of the reporting and adjusting of which will be shown later. *121 Issue I Findings of Fact On September 12, 1939, the Saginaw Stamping & Tool Co. entered into a contract with petitioner under which he agreed to hold it and the U.S. Government free and absolved "from any liability or claims which might accrue from the use of certain features incorporated in * * * trailers" which it proposed to manufacture "on which said Ray Harroun might have application for U.S. letters of patent or any application for U.S. letters of patent on said features which might be applied for during the fulfillment of" a proposed contract with the United States Government. In consideration thereof the company agreed to pay petitioner $35 each on the first lot of 25 trailers and decreasing amounts on lots of 25 thereafter manufactured, payments to be made "when and as said trailers are accepted and paid for by the Government." Maxwell K. Pribil was vice-president of the Saginaw Stamping and Tool Co., in which his mother had a stock interest; but the company was not controlled by the Pribil family. On September 16, 1939, petitioner and Pribil filed application for a patent for a "coupler" or "hitch", designed inter alia "to facilitate the coupling and uncoupling *122 of the trailer from the touring vehicle." Patent No. 2,309,766 was granted February 2, 1943, to "Ray W. Harroun and Maxwell K. Pribil, Saginaw, Mich.; said Harroun assignor of one-sixth to Helen M. Harroun, Saginaw, Mich., and said Pribil assignor of one-fourth to Severina Pribil, Saginaw, Mich." Prior to the taxable year (1941) some amounts had been paid under the above contract, the details of such payments not being shown. It was the practice of petitioner, which continued throughout the taxable period, to cash the checks and pay over to Pribil his share. The balance was deposited by petitioner in one of his bank accounts. During the taxable year petitioner received payments under the contract aggregating $58,299.20. $6,447.68 of this amount was received prior to February 7, 1941. On this date a document was executed by petitioner (the italicized portion being in pen and ink and the remainder typewritten) reading as follows: ASSIGNMENT "Whereas I, Ray W. Harroun, jointly with Maxwell K. Pribil, of Saginaw, in the County of Saginaw, and State of Michigan, have invented certain improvements in 'Automotive Trains' for which we have made application for Letters Patent of the *123 United States; and whereas Helen M. Harroun, wife, of Saginaw, in the County of Saginaw, and State of Michigan, is desirous of acquiring an interest therein; "Now therefore, in consideration of One Dollar ($1.00) and other valuable considerations, the receipt of which is hereby acknowledged, I, Ray W. Harroun, by these presents do sell, assign, and transfer unto Helen M. Harroun, my wife, an undivided one-third (1/3) of my full and exclusive right, for the territory of the United States of America, and not elsewhere, in and to the said invention, as described in the application filed by us on the sixteenth (16th) day of September 1939, Serial No. 295,306, preparatory to obtaining Letters Patent of the United States therefor; said invention, application, and Letters Patent to be held and enjoyed by the said Helen M. Harroun for her interest, for her own use and behoof, and for her legal representatives, to the full end of the term for which said Letters Patent may be granted, as fully and entirely as same would have been held by me had this assignment and sale not been made. Helen M. Harroun to be credited with all 1/3rd of Royalty payments beginning as of Jan. 1-1941. "(Signed) *124 Ray W. Harroun "WITNESSES: "Maxwell K. Pribil "Executed this 7th day of Feb. 1941." The document referred to above, exclusive of the portion in hand writing, had been prepared by a patent lawyer in Bay City, Michigan. The record does not indicate precisely when, if ever, it was delivered to petitioner's wife. At an undisclosed time petitioner took the document to a patent lawyer who informed him that the assignment was not in a form acceptable to the patent office for the purpose of recording. On February 10, 1942, petitioner executed a document which was recorded in the Patent Office on February 14, 1942, reading as follows: ASSIGNMENT "Whereas I, Ray W. Harroun, jointly with Maxwell K. Pribil, of Saginaw, in the County of Saginaw, and State of Michigan, have invented certain improvements in 'Automotive Trains' for which we have made application for Letters Patent of the United States; and whereas Helen M. Harroun, of Saginaw, in the County of Saginaw, and State of Michigan, is desirous of acquiring an interest therein; "Now, therefore, in consideration of One Dollar ($1.00) and other valuable considerations, the receipt of which is hereby acknowledged, I, Ray W. Harroun, *125 by these presents do sell, assign, and transfer unto Helen M. Harroun an undivided one-third (1/3) of my full and exclusive right, for the territory of the United States of America, and not elsewhere, in and to the said invention, as described in the application filed by us on the sixteenth (16th) day of September, 1939, Serial No. 295,306, preparatory to obtaining Letters Patent of the United States, therefore; said invention, application, and Letters Patent to be held and enjoyed by the said Helen M. Harroun for her interest, for her own use and behoof, and for her legal representatives, to the full end of the term for which said Letters Patent may be granted, as fully and entirely as same would have been held by me had this assignment and sale not been made. "(Signed) Ray W. Harroun "WITNESSES: "@H. L. Clancey "Justine H. Clancey "Executed this 10th day of Feb. 1942 "Recorded U.S. Patent Office Feb. 14, 1942 Conway P. Coe Commissioner of Patents" A non-ecxclusive license agreement was also executed by petitioner at an undisclosed time to Electric Vehicle Co. of Quincy, Ill.; but no amounts were received by him under such agreement during the taxable year. Petitioner *126 had been married prior to his marriage to his present wife and his divorced wife had made some threats to the effect that she would attempt to secure some of his property in the event of his death. Joint bank accounts of petitioner and his wife were maintained in Saginaw, Detroit and Miami. They also had a safety deposit box, which could be entered at any time by either of them or by petitioner's step-daughter. In 1940 petitioner's mother-in-law died, leaving an estate from which his wife ultimately received approximately $10,000. The amounts received by petitioner from Saginaw Stamping & Tool Co. during 1941 were deposited in the joint bank accounts. In petitioner's income tax return for 1941 he reported as rents and royalties $19,806.67, designating this amount in Schedule B as "Patent Rights". His wife filed a separate return and included in her gross income $9,903.33 from the same source. The Commissioner made the adjustment indicated above, including in petitioner's income the additional amount of $9,342.93. The several purposes motivating petitioner in executing the above documents were: to protect his wife's rights, especially against his divorced wife, in the event of *127 his death; to minimize his income tax liability; to secure his wife's cooperation in the promotion of his business; and to repay her for her promise that amounts received from the estate of her deceased mother would be treated as belonging to both. No delivery of either of the documents within the taxable year has been shown. Opinion The issue is discussed by counsel for petitioner purely as a question of law. He interprets it as posing only the question "whether the assignment was effective as of February 7, 1941, when it was made, or whether it only became effective on February 10, 1942, when a corrective assignment was * * * made in order to meet the requirements of the Patent Office for the recordation of assignments." Respondent quotes at length from the testimony, points out inconsistencies, inaccuracies and conflicts in petitioner's statements, urges that neither a gift nor a sale of the property producing the income has been shown and insists that whether considered purely as a question of law, a question of fact, or as a mixed question of fact and of law petitioner has failed to prove that the amount in issue was improperly included in his gross income. *128 Transactions between members of a family should be carefully scrutinized especially where, as here, one of the admitted purposes of the alleged transfer of property is to reduce taxes. This is not to say that a man may not, in good faith, make a gift to his wife of income producing property. Cf. Blair v. Commissioner, 300 U.S. 5. The crucial question in the instant case therefore is whether a valid gift, sale, or transfer of the property was actually made prior to the alleged payment of a portion of the income to the wife. In seeking the answer we must examine the documents and all of the circumstances surrounding their execution and delivery. The evidence consisted solely of petitioner's testimony and documents produced by him. Reviewing it chronologically, he identified his signature on the document dated February 7, 1941, and it was received in evidence upon his statement it had been executed by him on the date it bears. In answer to a question whether he delivered it to his wife he stated that he did, later stating he "delivered that immediately." The remainder of his testimony upon direct examination was devoted to other issues. On cross-examination counsel for *129 respondent elicited the information that the "other consideration" referred to in the document consisted in part of an agreement with his wife that she would "regard" him as part owner of her mother's estate when received, that one purpose in conveying an interest in the patent to her was to protect her right in the event of his death, that another was for the purpose of securing her cooperation in connection with sales promotion work, and that another was to save taxes. The method of handling the amounts collected - cashing the checks, paying one-half to Pribil and putting one-half in the joint bank accounts - was then related. Continuing to answer questions asked him upon cross-examination, petitioner reiterated that he delivered the document to his wife at the time it was executed. He qualified that statement immediately by saying he thought he had it recorded first at the Patent Office. He then stated the document had not been in proper form and that another one had been executed but he could not recall when. Pressed by counsel for more specific information with regard to the delivery of the instrument and responsive to a suggestion that his wife appeared to have been in Florida *130 on the date shown on the instrument, petitioner stated: I didn't hand it to her at that time. As I said before. I turned it over to the lawyer to be recorded first. As I recall, the Patent Office returned it, or he said it could not be recorded in that form, and I had to draw up some other papers at some later date. Then I did deliver it to her very shortly, when I say immediately. The first time I was with her. Upon redirect examination the following questions were asked and answers given: Q. When you executed this assignment on February 7, 1941, you testified in the first place on direct examination you delivered it to your wife. On cross examination in one place you testified maybe you didn't deliver it to your wife, because she was in Florida, led by the attorney for the government. And in another place you testified your wife did not go to Florida until the latter part of 1941. Now, can you refresh your recollection and say whether or not you remember delivering that to your wife or didn't you deliver it or do you not remember. I just want to get the record straight. A. I am sure I turned the assignment over to my patent attorney in Bay City, Mr. Leahman, and as nearly *131 as I can recall, I stated I don't know whether he sent it to Washington first and they refused to accept it on account of the form not being just right, but I do know he requested me later on that year to - he drew up another assignment to comply with the tax office requirements and I filed that. In the meantime I delivered that to my wife as soon as he returned it to me; the first time I saw my wife, I gave it to her. Q. Now, do you have a copy of the other assignment which was drawn as a correction of this assignment? A. I don't think so. I think my attorney has that. I could look at it though. Q. Then you signed this paper on February 7, 1941, and turned it over to your attorney to have it sent to the Patent Office to be recorded and he later said that this would not meet with the Patent Office rules and he had to draft a corrective assignment which you signed and sent to the Patent Office? A. That is right. Under re-cross examination petitioner was asked whether he remembered the circumstances surrounding the delivery of the document of February 7, 1941, to which he replied, "No, I don't." Q. "You don't remember where it was?" A. "No." Q. "You don't remember when it *132 was?" A. "Not definitely, no." * * * Q. "Do you ever remember giving her or turning over to her the revised assignment that he [the attorney] made up?" "No, I don't remember. I do know that was in a joint lock box immediately after I secured it." Q. "After you secured what?" A. "This [the document dated February 7, 1941] back from the attorney." Later he testified that the document had been taken from the joint lock box just prior to the hearing although he did not know who had put it in the box. On the second day of the trial petitioner testified that his wife had been present when the document was signed and read it at that time, saying "* * * she had been egging me on to get it done." Thereafter She very carefully, and for fear she would lose it, kept it in her own personal possession for some period of time, and we were in a hurry, were getting [ready] for a trip to Florida about that time, and I am quite sure we took it to Florida on that trip. He then stated that later on - either the first or second trip which he made to Detroit - he took it to the attorney and asked him to have it recorded in the Patent Office. "* * * He [the attorney] reported to me that the *133 tax office [Patent Office?] required a corrective instrument on account of some technicalities of the original instrument" so a new one was executed and recorded. The record was left open and the document last referred to (the second one shown in our findings) was later received in evidence. Substantially all of the evidence pertaining to the delivery of the instrument or instruments relied upon by petitioner to show that his wife was the owner of one-third of the amount paid by the Saginaw Stamping & Tool Co. to him in 1941, has now been referred to or set out in our findings. Is it sufficient to show that a valid and complete gift, sale, or other transfer of the income producing property had been made under date of February 7, 1941? No claim is now made that the income received prior to that date is divisible between petitioner and his wife, although in petitioner's return he so considered it to be. It is fundamental that an actual delivery and acceptance be shown, whether the transfer be by gift, by sale, or by other means. Assuming that there are instances when this requirement may be relaxed, an alleged transfer by a husband to his wife for the purpose of minimizing his *134 taxes is not one of them, especially when he is faced with the necessity of overcoming the prima facie presumption of correctness attaching to respondent's determination. Cf. Daniel J. Fry, 4 T.C. 1045. Moreover petitioner's retained control over the income - apparently it was treated the same way during the taxable year as it had been during the preceding year - militates against his contention that even a completed gift of the income had been made. Then, too, petitioner's argument upon the second issue - that all of the income was the result of his personal services and therefore should be included in computing his earned income credit - brings him face to face with the rationale of Lucas v. Earl, 281 U.S. 111, Burnet v. Leininger, 285 U.S. 136, and kindred cases. In the view which we take of the evidence it is unnecessary to consider petitioner's argument that an assignment of a patent, although not in a form acceptable for recording, may nevertheless be valid as between the parties, nor need we discuss at length respondent's contention that the evidence shows several conflicting motives for the attempted transfer. Assuming, also, that petitioner *135 was merely hazy in his recollections and, as his counsel urges, "was not attempting to falsify his testimony", it is sufficient to say that the trier of the facts was equally "hazy" as to what had occurred in connection with the delivery of the several documents at the conclusion of the trial and a careful examination of the transcript of petitioner's testimony has not removed the fog of uncertainty. Under the circumstances, therefore, the Commissioner's determination that all of the income from royalties is to be included in petitioner's gross income may not be set aside. Issue II Findings of Fact In petitioner's return for 1941 he claimed an earned income credit of $1,400. Respondent reduced it to $683.13, computed as follows: Sales Commissions
$6,855.29
Plus Fees from H.T.S. Eng.
Co.
401.00
$7,256.29
Less Traveling Expenses
425.00
Earned Net Income
$6,831.29
Earned Income Credit
10% of $6,831.29
683.13
By an amendment to petition, filed with leave of court, petitioner alleges that respondent erroneously computed his earned income credit "without considering royalties in the sum of $19,806.87 as earned income." Opinion The facts *136 pertinent to this issue - including those shown in the general finding and in the findings on the first issue - are not in dispute. Both parties admit that royalties of at least $19,806.87 were received by petitioner. The sole question therefore is whether they are to be included in computing the earned income credit. The applicable statute and regulations follow: SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. (a) Credits for normal tax only. - There shall be allowed for the purpose of the normal tax, but not for the surtax, the following credits against the net income: * * * * *
(4) EARNED INCOME DEFINITIONS. - For the purposes of this section - (A) "Earned income" means wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered, but does not include any amount not included in gross income, nor that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in *137 which both personal services and capital are material income producing factors, a reasonable allowance as compensation for the personal services actually rendered by the taxpayer, not in excess of 20 per centum of his share of the net profits of such trade or business, shall be considered as earned income. (B) "Earned income deductions" means such deductions as are allowed by section 23 for the purpose of computing net income, and are properly allocable to or chargeable against earned income. (C) "Earned net income" means the excess of the amount of the earned income over the sum of the earned income deductions. If the taxpayer's net income is not more than $3,000, his entire net income shall be considered to be earned net income, and if his net income is more than $3,000, his earned net income shall not be considered to be less than $3,000. In no case shall the earned net income be considered to be more than $14,000. Section 19.25-2 of Regulations 103: Sec. 19.25-2. Earned income credit. - Under section 25 (a) (3) the earned income credit allowable for the purpose of computing the normal tax is 10 percent of the amount of the earned net income, but not in excess of 10 percent *138 of the amount of the entire net income. The entire amount received as professional fees may be treated as earned income if the taxpayer is engaged in a professional occupation, such as a doctor or a lawyer, even though he employs assistants to perform part or all of the services, provided the clients or patients are those of the taxpayer and look to the taxpayer as the person responsible for the services performed. * * * * *
In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, a reasonable allowance as compensation for the personal services actually rendered by the taxpayer shall be considered earned income, but the total amount which shall be treated as the earned income of the taxpayer from such a trade or business shall, in no case, exceed 20 percent of his share of the net profits of such trade or business. No general rule can be prescribed defining the trades or businesses in which personal services and capital are material incomeproducing factors, but this question must be determined with respect to the facts of the individual cases. * * * * *
As pointed out above, petitioner's argument *139 upon this issue tends to weaken his argument upon the first issue. The gist of it is that the royalties were secured - first from his services in assisting Pribil in inventing the article and second from "his efforts in creating the market which produced the income out of which the royalties were paid." Evidence with reference to the latter is quite meager. Petitioner testified that he did some promoting of the use of the patented article. However, the only sales shown to have been made were to the United States Government. Some trips were apparently made by petitioner to Washington, which, it may be assumed, were in connection with the products being purchased by the government from Saginaw Stamping & Tool Co. Exhibit B, however, shows that petitioner received from this company, in addition to the royalties, salary of $266, director's fees of $135 and commissions of $11,704.61. The item of sales commissions adopted by respondent in the computation shown above was apparently taken from Line 9 of petitioner's return, which lists that amount ($6,855.29) as "Income (or loss) from partnerships., fiduciary income; and other income." The disparity between the aggregate of the three items *140 and the amount included in the return on Line 9 is not accounted for. In the absence of any evidence upon the subject, conclusion that the services rendered by petitioner to the corporation had been compensated for by the salary, fees and commissions shown above seems to be justified. The basic question whether royalty income is earned income within the purview of the statute has been answered in the negative in John E. Greenawalt, 27 B.T.A. 936, and E. Phillips Oppenheim, 31 B.T.A. 563. In the absence of any showing that a portion of the amount paid to petitioner as royalties actually constituted wages, salaries, professional fees or other amounts received as compensation "for personal services actually rendered", we must, on the authority of the cited cases, decline to disturb the respondent's computation of petitioner's earned income credit. Issue III Findings of Fact During the calendar year 1941 petitioner paid $720 as rent for an apartment in downtown Saginaw. The apartment was maintained principally for the purpose of giving petitioner an office and headquarters where he could conduct his business. He kept his general files there, in filing cabinets, *141 made drawings upon a drawing board, interviewed and entertained people with whom he did, or hoped to do, business and, purely as a matter of convenience and to avoid paying hotel bills while away from his homes at Detroit. Pine Lake and Miami, slept there approximately 100 nights. His wife spent not to exceed 10 nights during the year in the apartment. In petitioner's income tax return he deducted one-half of the amount paid, i.e., $360 as an ordinary and necessary business expense. Respondent allowed one-half of the amount claimed as a deductible business expense. $360 of the $720 was an ordinary and necessary business expense. Opinion The last finding is dispositive of the issue. It would serve no useful purpose to attempt complete rationalization of the finding or to review the evidence at length. Petitioner's characterization of the apartment as one of his "homes" has been noted, as stressed by respondent in his argument upon brief. Nevertheless we are of the opinion that it was more in the nature of an office or a place to transact business. Whether the entire amount paid might have been allowed if within the pleadings we do not suggest or decide. It is sufficient for present *142 purposes to hold, as we do, that $360 was expended as rent during the taxable year for property used in petitioner's trade or business. It is therefore allowed as an ordinary and necessary business expense. Issue IV Findings of Fact During the taxable year petitioner owned six boats of the type used with outboard motors. They ranged from 8 to 16 feet in length and were used about 90 percent of the time for experimentation and 10 percent for pleasure. Some of the boats had been purchased prior to January 1941 and the remainder before June of that year. None of them directly produced income for petitioner. Two were racing boats although they were not used for that purpose in 1941. Three were still in petitioner's possession in 1945, when trial of this case occurred, and they were still being used for experimentation although on a restricted basis due to lack of gasoline. Three had been sold in 1943 at undisclosed prices. The total cost to petitioner of the boats was $2,000. They were kept at Pine Lake where petitioner's summer home was located. In petitioner's return he deducted $600 as depreciation on the six boats. Respondent allowed $300 and disallowed the remainder. A *143 reasonable allowance for the exhaustion, wear and tear of the boats used in petitioner's trade or business, including a reasonable allowance for obsolescence, is $500. Opinion Section 23 (1) I.R.C. provides for a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) of property used in the trade or business. The evidence indicates, and respondent's allowance of $300 shows that he agrees, the boats were used in petitioner's trade or business; so the question is solely what amount should be allowed. Here again the record is not very satisfactory. Petitioner expressed the opinion the useful life of the boats was two years. He was referring principally to the engines. The fact that all of the boats appear to have lasted at least twice that long indicates he may have been too pessimistic in his estimate. As is frequently the case, respondent relied upon his cross-examination of petitioner - the sole witness who testified - to show that a smaller amount than the witness had estimated was a reasonable amount and no additional evidence was adduced. A careful appraisal of all of the evidence convinces us that *144 $500 is a reasonable amount and we so hold. Issue V Findings of Fact In schedule C attached to petitioner's return he deducted: Depreciation on car used for
business 25% Olds
$400.00
Fuel, oil, tires, etc. used for
business 15,000 mi. at.03
425.00 The Commissioner allowed one-half of each amount and disallowed the balance. During 1941 petitioner maintained two automobiles, one of which was used principally for business, traveling and experimentation and occasionally for personal use. The other was used principally for personal use but occasionally for business. The business use consisted of traveling to and from places where customers and prospective customers were interviewed, especially from Saginaw to Detroit, and in driving for the purpose of testing inventions or devices upon which petitioner was working, especially accessories for automobiles. The total mileage driven on business was at least 15,000 miles. The amount claimed as depreciation is a reasonable amount. The amount claimed for fuel, oil, tires, etc., was expended while traveling on business and constituted an ordinary and necessary business expense. Opinion The findings are *145 dispositive of both issues. The evidence convinces us that the automobile was used almost exclusively for business purposes and both amounts appear to be reasonable. It is true, as respondent points out, that the last amount is largely an estimate. Petitioner testified, however, that at the time he made out his return he had sufficient data from which he could - and did - determine that he had driven at least 30,000 miles during 1941. The data was not produced since, if still in existence, it was at Detroit while the trial was in Miami. We have found, however, that the car was driven at least 15,000 miles upon business during the taxable year and three cents a mile is not an unreasonable amount to be expended for fuel, oil, tires, etc. The amounts claimed are therefore allowed. Issue VI Findings of Fact During the taxable year petitioner was away from his home in the pursuit of his trade or business approximately 100 days, attempting to secure contracts for the sale of devices he had invented, making arrangements with manufacturing concerns for the manufacture of such products, experimenting upon improvements for automobiles and accessories, and advising users in the care and *146 use of such devices. He also cetertained customers and prospective customers modestly. The aggregate amount expended for meals, lodging and entertainment was $850. This amount was an ordinary and necessary business expense. All of it was claimed as a deductible item in petitioner's return; but onehalf of its was disallowed by the Commissioner. Opinion Upon brief respondent urges that his determination should be sustained, saying, inter alia: Other than the merest generalities, there is no showing as to the number of trips taken, where they were taken and the purpose for which they were taken. Since the testimony, even in generalties, is to the effect that it was in the promotion of the patent, a one-half interest of which was owned by Mr. Pribil, the petitioner may have been reimbursed for such expenses or could have claimed a reimbursement therefor, if it was justified in the advancement of the promotion of that patent, from any others who might have an interest in the patent. While it is true the testimony was rather general we are of the opinion it is sufficient to justify the allowance claimed. Petitioner testified that at least that amount was expended; and unless we *147 disbelieve his testimony with reference to the length of time he was away from home - which we have no reason to do - the amount claimed seems to be entirely reasonable. The reasonableness of the amount is doubly pointed up by his statement that it also includes amounts expended for entertainment. So far as the suggestion that Pribil should be charged with part of it is concerned, petitioner testified categorically that he had no arrangements with anyone under which he was to be reimbursed. Moreover, the evidence does not justify the conclusion all of the traveling was in connection with the patent in which Pribil was interested. While we have not made any finding to that effect, it is reasonable to conclude that some part of the travel was due to his employment by Saginaw Stamping & Tool Co., in connection with which substantial income was realized. Also that some of it was in connection with testing of automotive devices upon which he was working and in which Pribil was not interested. Finding has been made that the amount was expended by petitioner while away from home in pursuit of his trade or business. To the extent that it was expended in entertaining customers it was also *148 an ordinary and necessary business expense. Respondent erred in disallowing one-half of the amount claimed. Issue VII Findings of Fact Petitioner was president and general manager of, and owned a one-quarter interest in, H.T.S. Engineering Corporation, which had been formed in 1940 for the purpose of developing an experimental engine in which he was interested. In connection with his personal experimental work petitioner had acquired some lathes, drill presses, grinders and other machinery of the type usually found in an ordinary tool shop. After the organization of the corporation petitioner turned the tools owned by him over to it upon a rental basis. He also purchased additional machinery of the same general type in 1941, which was likewise turned over to the corporation. The total cost to petitioner of all of the machinery was $8,956, approximately $7,000 of which had been purchased in the early part of 1941. The rent received by petitioner from the corporation in 1941 was $402.58, no part of which was included in gross income but all of which was included by the Commissioner in his determination of the deficiency. The correctness of the inclusion is not in issue. The *149 H.T.S. Engineering Corporation was engaged in the production of war materials for the Glenn Martin Aircraft Corporation. The machinery was used at least 54 hours per week and was repaired only when it was necessary in order to keep it running. There was no provision in the lease agreement obligating the corporation to return the machinery to petitioner in any particular condition and it was still being used by the corporation at the time of the trial. Machinery of the type mentioned ordinarily has a useful life of ten years. Because of the excessive use to which the machinery was put during the taxable year its useful life was not in excess of 7 1/2 years. No certificate of the Secretary of War or of the Secretary of the Navy was ever secured by petitioner that the machinery was necessary in the interest of national defense, as provided in section 124 (f) (1) and (f) ( 3) (B) I.R.C., added by section 302 of the Second Revenue Act of 1940, nor did petitioner submit, within the time prescribed by sec. 124 (a) I.R.C., as amended by section 155 (b) of the Revenue Act of 1942, a "statement in writing to the Commissioner" to the effect that he elected to take the *150 60-month amortization deduction authorized by section 124, supra, and "to begin such with either the month following the month within which the facility was completed or acquired or with the succeeding taxable year." In petitioner's return for 1941 he deducted $2,003.67, explaining it - "Depreciation on Machinery operating on war contracts, 20%." The Commissioner disallowed $1,555.82 as excessive depreciation. A reasonable allowance for the exhaustion, wear and tear of the machinery, including a reasonable allowance for its obsolescence, is $1,194. Opinion We view the question purely as one of fact and have determined that the machinery, considering the use to which it was being put, had a useful life of 7 1/2 years. The amount allowed as depreciation is, therefore, $1,194. Since reference is made in our findings to the lack of a certificate of necessity and a statement in writing to the Commissioner to the effect that the taxpayer had elected to take 60-month amortization of a war facility, brief explanation of these provisions will be made. Section 302 of the Second Revenue Act of 1940, which became section 124 I.R.C. defines the terms used - emergency *151 facility, emergency period, etc. - and authorizes (originally only a corporation but amended by section 155 of the Revenue Act of 1942 to include "a person other than a corporation") an election by the taxpayer to take an amortization deduction over a 60-month period in lieu of the deduction provided by section 23 (1) I.R.C. relating to exhaustion, wear and tear, and obsolescence. It requires a certificate of the Secretary of War or of the Secretary of the Navy that the facility is in the interest of national defense and prescribes the manner of making the election, which includes, inter alia "a statement in writing" to the Commissioner. Petitioner does not contend that he complied with the requirements of these acts so they have no real pertinency. They, however, are set out at length in respondent's brief and the essence of his argument seems to be that petitioner may not have "exhaustion of machinery used in war production within a 60-month period" unless he shows compliance with the statute cited. He also contends that the evidence does not justify an allowance in excess of 10 per centum per annum. We agree with petitioner's contention that if he shows that *152 the machinery, because of the use to which it is put, depreciates at a rate in excess of the normal rate, the depreciation actually sustained may be allowed. We therefore examine the evidence. Petitioner, shown to have some knowledge of machinery and familiarity with normal depreciation, expressed the opinion that his would depreciate much more rapidly than normal because of the use to which it was put. He estimated its useful life at not more than five years and therefore contends he correctly deducted depreciation at 20 per centum. Respondent insists petitioner should have shown the repairs and replacements actually made, or lack thereof, during each year in order to ascertain whether the machines were being kept in normal repair and that a detailed list of the machines, showing the cost and type of each, should have been furnished so that we might have more exact knowledge of them. He also insists that the small amount of overtime use which has been shown does not justify accelerated depreciation. A careful analysis of all of the evidence convinces us that more than normal depreciation is being sustained and we have determined that the useful life of the machinery will be approximately *153 7 1/2 years. Depreciation of $1,194 is therefore allowed. Decision will be entered under Rule 50.