*Decision will be entered under Rule 50.*

D. & N. AUTO PARTS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11445. Promulgated June 18, 1947.

*Nelson E. Taylor, Esq.,* for the petitioner.
*D. Louis Bergeron, Esq.,* for the respondent.

1194

.

## OPINION.

DISNEY, *Judge*: The only question we have here is whether the Commissioner erred in computing excess profits tax for the taxable years by considering $10,400 per year the reasonable compensation of the partners during the base period years, in determining excess profits tax credit. The parties do not disagree as to the facts that the previous partnership was a component corporation within the meaning of section 740 (b) (1) (5), Internal Revenue Code, and that computations are required under section 742 (g), Internal Revenue Code, as if the partnership were a corporation; and both rely upon Regulations 112, section 35.742–1 (b) (2), providing in pertinent part that among the adjustments necessary in computing excess profits net income or deficit are: "A reasonable deduction for salary or compensation to

each partner or the sole proprietor for personal services actually rendered shall be allowed."

The partners actually received $5,200 each in the taxable years by way of a drawing account, before division of partnership profits. The Commissioner used $10,400 in computing the excess profits tax credit. The petitioner, in its original excess profits tax returns for the fiscal years 1941 and 1942, also used $10,400, but after filing its return for 1943, on November 1, 1943, it filed amended returns for 1941 and 1942, using $6,000 for each of the last three base period years and $7,550.98 for the first base period year. These figures it had used in its excess profits tax return for 1943. The Commissioner determined deficiencies according to the difference in the figures used by him and petitioner.

We first consider the petitioner's contention that the figures used by it are proper because they are the proper figures for "earned income" upon which "earned income credit" was based under the provision of section 25, Revenue Act of 1936,[1] and as applied to partners by sections 184 and 185, Revenue Act of 1936. The contention is, in short, that, since under section 25 (a) (4) 20 per cent of net profits shall be considered earned income when the taxpayer is engaged in a business where, as here, both personal services and capital are material income producing factors, and since such 20 per cent was $7,550.98 for 1937 and $6,000 for the remaining base period years (total for the two partners) that figure must be used in computing excess profits tax. To this the respondent replies that "earned income credit" under section 25 is not the criterion; that the section is a relief section, in the nature of an additional exemption for normal tax computation, to be used solely for that purpose. In our opinion the respondent's view is correct. Section 25 (a) is headed "Credits for Normal Tax Only" and states specifically "There shall be allowed for the purpose of the normal tax, but not for the surtax, the following credits against the net income: * * *" In subsection 4 it defines "Earned income" "For the purposes of this section." In the light of such provisions we think we may not, for the purpose of another portion of the statute, involving excess profits tax, limit the range of

[1] SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME.

(a) CREDITS FOR NORMAL TAX ONLY.—There shall be allowed for the purpose of the normal tax, but not for the surtax, the following credits against the net income:

\* \* \* \* \* \* \*

(3) EARNED INCOME CREDIT.—10 per centum of the amount of the earned net income, but not in excess of 10 per centum of the amount of the net income.

(4) EARNED INCOME DEFINITIONS.—For the purposes of this section—

(A) "Earned income" means wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered \* \* \*. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income producing factors, a reasonable allowance as compensation for the personal services actually rendered by the taxpayer, not in excess of 20 per centum of his share of the net profits of such trade or business, shall be considered as earned income.

inquiry as to what is a reasonable deduction for salary or compensation merely to a computation of earned income under section 25, where clearly the matter is one of an exemption in the form of a credit. The fact that "earned net income" is arbitrarily set as not less than $3,000, or more than $14,000 indicates that the concept does not in general govern the question of fact as to what is reasonable compensation, which might be actually above or below that range. Obviously, under section 23 (a) (1) a salary under $3,000 or over $14,000 might be a reasonable deduction. The respondent's contention on the point is sustained.

The petitioner contends also that the determination of deficiency is invalidated because it is based upon the allotment of executive salaries in the lump sum of $10,400 instead of separately to each partner, under the language of the regulation providing for adjustment by allowance of "a reasonable deduction for salary or compensation to each partner * * *." Petitioner cites *Shield Co.*, 2 T. C. 763, and *L. Schepp Co.*, 25 B. T. A. 419, as authority that salaries should be separately considered as to reasonableness. However, even assuming that in this matter of excess profits tax and computation of excess profits tax credit the same considerations apply as in the case of section 23 in regard to reasonable salaries thereunder, *Miller Mfg. Co.*, v. *Commissioner*, 149 Fed. (2d) 421, is against petitioner's view; for there, though agreeing that proper procedure is for the Commissioner and Tax Court to find definitely what is reasonable compensation for each officer, rather than in an aggregate lump sum, the Circuit Court nevertheless holds that such lump sum determination does not rob the Commissioner's finding of presumption of correctness or relieve petitioner of the burden of proof. The court refused to remand for specific findings as to each officer. We are therefore of the view that the burden of proof and validity of the determination of deficiency are not affected by the form of determination of reasonableness of compensation, in a lump sum.

We come then to the factual question as to whether the Commissioner erred, in computing excess profits tax credit, by allowing deduction in the base period years of $10,400 each year for partners' salaries or compensation. The petitioner thought those figures were reasonable when it filed its excess profits tax returns for the fiscal years 1941 and 1942, but it now says that it erred in so considering. It used the lower figures ($7,550.98 for the first base period year and $6,000 thereafter) when it came to file its excess profits tax return for the fiscal year 1943, the first to show a tax due. This is clearly a case of "blowing hot and cold" as affected by tax results. It was not until after the filing of the 1943 return that those for 1941 and 1942 were amended to use the lower figures. The attitude taken at an

earlier date, without monetary reason to do so, must logically be considered with the other evidence in deciding what is the reasonable figure for salaries, for the treatment and interpretation by parties are always pertinent in ascertaining intent. After the partners had for four years drawn $5,200 each per year on a drawing account, and after the petitioner corporation had for two years computed base period net income by using those figures as reasonable compensation, a lowering of those figures to secure better tax results must be scrutinized with care. That fact, however, does not alone control; the control lies in all of the pertinent facts. These we have carefully examined. The petitioner urges, in effect, that Manscoe was not reasonably worth $5,200 per year because of the condition of his health, especially after the fiscal year 1937. He died in August 1940.

The evidence is indefinite in some respects. It is apparent that he did work even contrary to his doctor's ideas, and evidence that he was incapacitated from carrying on his work does not appear earlier than the last year before his death. Yet his physician testified that his condition was about the same in 1939 as in 1938, so that it does not affirmatively appear that he could not substantially carry on, even as late as 1939. Only after the latter part of 1938, or early in 1939, was he unable to "put in full days," and whether that means all or only a part of the time is not clear. The partnership permitted him to draw $5,200, and the corporation even later considered it reasonable. We find ourselves unable to say that he was not reasonably worth that amount, even though he may not have put in very full time, or even not much time, toward the last. He apparently was a valuable man, and his contribution, even despite illness, may have been worthy of his hire. The argument that because of his condition earnings decreased does not seem to be borne out by the record, for, though earnings decreased from about $37,000 for the fiscal year 1937 to about $22,000 in 1938, there is very little to indicate any lessening of Manscoe's efforts or value so early as that time, and though profits then, for 1939, went down to about $19,600, they again rose to about $28,600 for the fiscal year ended April 1940—just at the time when Manscoe, under the evidence, was becoming incapacitated, and shortly before his death. It seems rather clear from all this that Manscoe's physical condition did not greatly affect the profits of the partnership; from which it follows, we think, that his reasonable worth to the partnership was not greatly affected.

The petitioner points out however, that the salaries used by the Commissioner in computing the excess profits tax credit upon base period income represent a much greater percentage of net profits than did executive salaries in later fiscal years, 1943 and 1944, approximately 39 per cent as against 22 per cent; and the point is not devoid

of force. But much of that force is dissipated by the fact that Post was the only executive whose salary is considered for 1943 and 1944, drawing $12,000 and $12,125, respectively (not greatly more than previously paid both Post and Manscoe in the partnership base years), whereas excess profits net income advanced for 1943 to $38,014.50 and for 1944 to $42,940.64. It seems obvious that Post carried on, for a comparatively small advance in salary, instead of the two former executives, so that of course the ratio of executive salary actually paid, to higher earnings, is lower. But we are not convinced thereby that the $10,400 compensation paid in the base period years was excessive and not reasonable. The petitioner for about three years after the close of the partnership continued to regard the base period compensation as reasonable, and it changed that view only with prospective change in tax results. We think the Commissioner is not shown to have erred in his determination, and that the compensation paid the partners in the base period was reasonable.

*Decision will be entered under Rule 50.*