ANNE MOEN BULLITT BIDDLE BREWSTER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7063–71. Filed November 30, 1976.

*Thomas E. Jenks, Herbert L. Awe,* and *Michael Mulroney,* for the petitioner.

*Jon T. Flask,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1962 | $25,071.98 | 1967 | $24,505.82 |
| 1963 | 17,945.48 | 1968 | 16,435.89 |
| 1964 | 32,787.48 | 1969 | 68,912.27 |
| 1965 | 2,498.02 | | |

The questions before us are: (1) Whether a portion of petitioner's gross farm income was excludable as earned

income under section 911[1] when her foreign farming proprietorship operated at a loss, (2) if a portion was so excludable, the amount thereof, and (3) the amount of petitioner's farming expenses "allocable to or chargeable against" the excludable income.

### FINDINGS OF FACT

Some of the facts have been stipulated and, together with the stipulated exhibits, are incorporated herein by this reference.

Petitioner was a citizen of the United States and a bona fide resident at Palmerstown Stud, in Kill, County Kildare, Ireland, at the time of filing her petition herein and during all of the years at issue. She filed timely individual Federal income tax returns for the years 1962 through 1969 with the Director, Office of International Operations, Internal Revenue Service, Washington, D.C.

At all times material herein, petitioner was engaged in the farming business in Ireland as an individual proprietor. Both petitioner's personal services and capital were material income-producing factors in the business.

Petitioner acquired her farm, Palmerstown Stud, in 1956 after an extensive search. The premises are favorably situated on limestone land which is considered to be desirable for raising horses. The farm encompasses 700 acres. In 1962, petitioner owned approximately 120 horses at Palmerstown. By 1969, that number had increased to about 200, most of which were brood mares and immature stock with approximately 25 to 30 racing horses in training. During the years in question, petitioner employed 45 or 50 individuals at all times.

Petitioner operated both a horse breeding farm and a training and racing stable at Palmerstown. In addition, each year petitioner grazed about 250 head of cattle which were useful for keeping the horse pastures in good condition and for controlling parasites.

Originally, petitioner intended only to carry on thoroughbred horse breeding; however, because of dissatisfaction with the results produced by public trainers, she began to train

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect during each of the years before the Court.

horses at Palmerstown. Petitioner believed that the combination of breeding and racing operations, which had developed fully at Palmerstown by the beginning of the period in question, would produce a greater degree of knowledge about an individual horse's capacity, stamina, and temperament. Consequently, she believed that coordinated development would aid in both training and selection for breeding. With the exception of several smaller operations, a combined breeding farm and racing stable such as Palmerstown is unique in Ireland. During the years in question, Palmerstown was one of the largest thoroughbred horse operations in Ireland and horses bred and trained by petitioner won a number of internationally recognized races in Ireland, England, and France.

Petitioner was general manager and directed the breeding and racing operations herself during the years in question. She employed a stud groom who functioned as a foreman in charge of the breeding operation. Likewise, a head lad was employed and he functioned as a foreman in charge of the racing operation. During brief absences from Palmerstown by petitioner, the stud groom and head lad were left in charge of the breeding and racing functions. Petitioner performed all of the secretarial work. She employed an accountant to maintain Palmerstown's books and records. He also supervised planting, cattle grazing, and farm equipment operations. Petitioner supervised and directed the sale of the horses at Palmerstown.

For the years 1962 through 1969, petitioner realized the following income and expenses from the farming operation:[2]

| Year | Gross farm income | Gross farm expenses | Net farm loss |
|---|---|---|---|
| 1962 | $83,155 | $224,868 | [3]$141,713 |
| 1963 | 123,502 | 235,717 | 112,215 |
| 1964 | 38,238 | 234,241 | 196,003 |

---

[2] The figures as to gross farm income and gross farm expenses include adjustments to the amounts of these items as shown in the deficiency notice to take into account the effect of petitioner's horse racing activities, adjustments based upon the stipulation of the parties. In addition, gross farm income is exclusive of gain realized from the sale of horses. See pp. 365–367, *infra*. The amount of such gain is stipulated as follows: 1962, $84,951; 1963, $67,712; 1964, $159,770; 1965, $25,657; 1966, $30,411; 1967, $138,265; 1968, $68,400; 1969, $209,760.

[3] The parties stipulated this figure to be $141,173 in an obvious typographical error.

| | | | |
|---|---|---|---|
| 1965 | 55,647 | 273,408 | 217,761 |
| 1966 | 64,070 | 290,674 | 226,604 |
| 1967 | 58,947 | 299,391 | 240,444 |
| 1968 | 48,809 | 262,685 | 213,876 |
| 1969 | 57,840 | 288,391 | 230,551 |

On her Federal tax returns for each of these years, petitioner reported all of her gross farm income and deducted all of her farming expenses. Her gain from the sale of horses was reported separately as long-term capital gain. Thus, she offset her U. S. source income with 100 percent of the losses she sustained from her foreign business.

The respondent determined that 30 percent of petitioner's gross farm income was excludable from gross income under section 911 as earned income. He further determined that the portion of gross farm expenses allocable to the excludable income, and therefore nondeductible, was the same percentage of gross expenses that excludable income was of gross farm income. The net effect of respondent's determination (modified in accordance with n. 2 *supra*) is the reduction of petitioner's net farm loss for each year, except 1963, by 30 percent.[4]

Petitioner's farming expenses for the years in question were as follows: wages, social insurance for employees, feed for horses, grass seed for pastures, general supplies, repairs, fertilizers, stud fees and boarding expenses of brood mares at other stud farms, veterinary and medicine expenses, machinery operating expenses, insurance, bank interest and charges, electricity, telephone, rent, local taxes, carriage and freight for transporting horses, motor car expenses, horseshoeing,

| Year | 30% of gross farm income excluded | 30% of farm expenses disallowed | Reduction in farm loss |
|---|---|---|---|
| 1962 | $24,947 | $67,460 | $42,514 |
| 1963 | *35,000 | *66,801 | 31,801 |
| 1964 | 11,471 | 70,272 | 58,801 |
| 1965 | 16,694 | 82,022 | 65,328 |
| 1966 | 19,221 | 87,202 | 67,981 |
| 1967 | 17,684 | 89,817 | 72,133 |
| 1968 | 14,643 | 78,806 | 64,163 |
| 1969 | 17,352 | 86,517 | 69,165 |

* For this year, 30 percent of gross income exceeds the then-effective dollar limitation ($35,000) for the earned income exclusion. Sec. 911(c)(1)(B). The disallowance of farm expenses is accordingly proportionately reduced. See p. 365, *infra.*

cost of training horses at other farms, straw, peatmoss, management fees, saddlery, periodicals, stationery, postage, gratuities to employees, travel and entertainment, subscription and entry fees for the registration of horses in stud book, tools and short life equipment, advertising, cattle buyers' commissions and fees, legal expenses, rental of special machinery, and entrance and jockey fees for horse races.[5] No part of these expenses claimed by petitioner was attributable to her personal expenditures.

## OPINION

Section 911[6] affords a tax benefit to citizens who are residents of a foreign country to the extent that they realize income abroad as a result of their personal services (earned

---

[5] Petitioner also took deductions for depreciation in respect of property used in the business, but a portion of these deductions was attributed to the horses sold and reflected in the capital gain reported in respect of such sales.

[6] Sec. 911 provides in part:

SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, *amounts received* from sources without the United States (except amounts paid by the United States or any agency thereof) *which constitute earned income attributable to services performed* during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

\* \* \*

An individual shall not be allowed, as a deduction from his gross income, any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this subsection.

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer *engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.*

(Emphasis added.)

income) rather than as a return on capital investments. In the case of a service-capital business, the statute provides that "a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income."

On a prior occasion, this same taxpayer asked us to decide the identical question initially before us herein, namely, whether, under section 911, a citizen residing outside of the United States can have excludable "earned income" from a farming proprietorship in which both capital and personal services are material income-producing factors (service-capital business) when such proprietorship operates at a loss. In a Court-reviewed opinion, we answered that question affirmatively. *Anne Moen Bullitt Brewster,* 55 T.C. 251 (1970), affd. 473 F.2d 160 (D.C. Cir. 1972). We reasoned that the 30-percent limitation on the amount of net profits deemed to be earned income only applies to a business realizing net profits, since the limitation is expressed in terms of a percentage of net profits. Based upon this approach and because the benefit conferred takes the statutory form of an exclusion from gross income, we held that the excludable compensation factor was to be determined with reference to gross income. 55 T.C. at 254. Our decision was affirmed by the Court of Appeals for the District of Columbia in a per curiam opinion (473 F.2d 160 (D.C. Cir. 1972)), which rather extensively analyzed the issue involved and the views expressed by this Court.

Petitioner herein renews her contention that a proprietor of a foreign service-capital business generating losses cannot have any earned income within the meaning of section 911(b) and urges us to reexamine and abandon our position to the contrary. Respondent counters with the assertion that the rule established in *Jack E. Golsen,* 54 T.C. 742 (1970), affd. on the substantive issue 445 F.2d 985 (10th Cir. 1971), requires us to follow our prior decision in view of its affirmance by the Court of Appeals for the District of Columbia, to which an appeal from a decision herein would lie.

It is clear that a decision herein for respondent on this threshold issue is required under *Golsen*. Such being the case, we reject petitioner's renewed contention.[7]

We turn to the questions as to how the amounts of excludable gross income and related expenses should be calculated—questions which did not have to be dealt with in the previous case because such amounts were stipulated by the parties.

Petitioner contends that if she had realized "earned income" from her farming operations, it was not determinable as a flat percentage of gross income. Rather, she maintains that the proper measure of her earned income is the amount she would have had to pay employees as reasonable compensation to perform all of the services she performed.

In making her argument, petitioner suggests that if we apply the prior decision in *Anne Moen Bullitt Brewster, supra*, then the 30-percent figure in the net profits limitation contained in the second sentence of section 911(b) should not be imposed in determining what portion of gross income constitutes "a reasonable allowance as compensation for the personal services rendered" as provided in the preceding portion of that sentence. To the extent that petitioner's argument is based upon the assertion that the 30-percent figure should not be mechanically applied, we agree with her position. Given the theory of the decision in *Anne Moen Bullitt Brewster, supra*, we think that the amount of reasonable compensation can, depending upon the facts and circumstances of each case, be found to be above or below 30 percent of gross income.[8] From this point on, however, petitioner's approach misses the mark.

In the first place, we are not convinced, as petitioner urges, that we should adopt precisely the same test for determining

---

[7] We are cognizant of the intervening decision of the Court of Claims in *Vogt v. United States*, 537 F.2d 405 (Ct. Cl. 1976). But the issue in *Vogt* was an entirely different one, i.e., whether the dollar limitation of sec. 911 should be applied to a partner's share of the gross income or net income of a profitable personal service partnership, and the Court of Claims carefully distinguished *Brewster v. Commissioner*, 473 F.2d .160 (D.C. Cir. 1972), affg. 55 T.C. 251 (1970).

[8] Indeed, even if a 30-percent limitation applied under the gross income theory, it is clear from the second sentence of sec. 911(b) that it only provides a ceiling and would not preclude a finding of less than 30 percent. That situation does not exist herein because neither party is contending for a lesser amount.

reasonable compensation under section 911(b) as is utilized in the cases involving the allowance of a deduction for compensation paid or accrued under section 162(a)(1), although we recognize that the two sections use substantially the same language.[9] There are numerous factors which enter into the determination of reasonableness under section 162(a)(1). See, e.g., *Pepsi-Cola Bottling Co. of Salina, Inc.,* 61 T.C. 564, 567–568 (1974), affd. 528 F.2d 176 (10th Cir. 1975); 4A Mertens, Law of Federal Income Taxation secs. 25.69—25.81 (Malone rev.). Some of these factors are not present in a situation, such as is involved herein, where there is no compensation actually paid or accrued; rather the determination herein requires the construction of an *imputed* "reasonable compensation" geared directly to the portion of petitioner's gross receipts attributable to her services as opposed to her capital input. As we view the situation, only a combination of capital and personal services permits any receipts and this necessitates an inquiry as to the portion of the receipts which should be deemed attributable to each of such elements. Cf. *Mark Tobey,* 60 T.C. 227 (1973).

Thus, while it cannot be gainsaid that there are similarities in the decisional process under section 162(a)(1) and section 911(b), the latter situation has a somewhat different cast and the difficulties are perhaps even greater than those confronted in the former situation where, as has been observed, there is "no definite formula" (see *Jones Bros. Bakery, Inc. v. United States,* 411 F.2d 1282, 1291 (Ct. Cl. 1969)) or "universal rule" (see *Charles McCandless Tile Service v. United States,* 422 F.2d 1336, 1338 (Ct. Cl. 1970)). Compare *D. & N. Auto Parts Co.,* 8 T.C. 1192, 1196–1197 (1947).

In the second place, even if we were to agree that section 911(b) completely tracks section 162(a)(1), we would be unable to accept petitioner's argument herein. The bulk of that argument is based upon the contention that "the proper measure of petitioner's compensation is the amount she would have had to pay someone to replace her." Concededly, this is one of the elements to be taken into account but it cannot be

---

[9] Sec. 162(a)(1) allows a deduction, as an ordinary and necessary business expense, of "a reasonable allowance for salaries or other compensation for personal services actually rendered."

the sole element. If the latter were the case, the degree of profitability of the business (or, more accurately, the existence of continual losses) would be eliminated from our consideration, a clearly unacceptable consequence (see *The Barto Co.*, 21 B.T.A. 1197, 1199 (1931))—and one which also assumes that petitioner would be willing to expend the additional sums to compensate such replacement personnel notwithstanding the already large losses being incurred by the business (see *Crescent Bed Co.*, a Memorandum Opinion of this Court dated April 6, 1942, affd. 133 F.2d 424 (5th Cir. 1943)). Moreover, we would be unable to consider the degree to which petitioner's employees, such as the stud groom, the head lad, and the accountant (who discharged operational responsibilities), in fact performed services which would otherwise have been performed by the claimed replacement personnel and which lessened the extent of the activity demanded of petitioner. Finally, the standard suggested by petitioner would preclude consideration of the fact that petitioner's role was of a dual nature, consisting of contributions to the business not only in terms of the performance of services in a quasi-employee role but also in terms of her role as owner, i.e., using her resources to generate a return on her investment. Cf. *Charles McCandless Tile Service v. United States, supra* at 1338.

The ultimate question is what was the worth of petitioner's services in the generation of gross income of the business.[10] Although there is testimony as to how long and hard petitioner worked, we have been furnished with no evidence as to the value thereof, aside from the amount which purportedly would have had to be paid for replacement personnel. Such being the case, we are compelled to conclude that petitioner has failed to carry her burden of proof in overcoming respondent's determination that 30 percent of gross farm income constitutes "a reasonable allowance as compensation for the personal services rendered" within the meaning of section 911(b). In so concluding, we again emphasize that we are not adopting a mechanical formula for all cases. See pp. 358–359, *supra.* We are merely holding that,

---

[10] At the time the earned income credit was enacted by the Congress, the test as applied to a service-capital business was articulated as one "to determine what the man's own personal services are worth." See 65 Cong. Rec. 2850 (1924).

under the circumstances of this case, respondent's determination should not be overturned. In the foregoing context, any attempt by petitioner to upset respondent's determination on the ground that a flat percentage allowance will produce varying amounts of reasonable compensation from year to year falls by the wayside.

Petitioner further contends that, in computing the amount of her excludable earned income, the dollar limitations contained in section 911(c)(1), applicable to taxable years 1963 through 1965, should be increased in accordance with section 911(c)(7)[11] by the amount representing the value of the facilities of the business which she used. Under our holding, the dollar limitation applies only to the taxable year 1963. See p. 355, *supra.* Petitioner's argument is without merit. Although petitioner utilized the facilities of the business for personal purposes, e.g., the house and the automobiles, we know of no theory pursuant to which the value of such use or the deduction of the portion of the expenses allocable thereto could enter into the calculation of petitioner's taxable income from her sole proprietorship.[12] Even if some such theory could be constructed, it could not be said that such allocable portion of expenses was received as "compensation * * * in the form of the right to use." Sec. 911(c)(7). Compare *Challenge Manufacturing Co.,* 37 T.C. 650, 663 (1962) (disallowed expenses paid on behalf of a shareholder-employee not treated as compensation because not paid as such), and *Rapid Electric Co.,* 61 T.C. 232, 241 (1973) (to the same effect). Indeed, given this statutory language, there is a serious question whether it

---

[11] That paragraph provides:

(7) CERTAIN NONCASH REMUNERATION.—If an individual who qualifies under subsection (a)(1) receives compensation from sources without the United States (except from the United States or any agency thereof) in the form of the right to use property or facilities, the limitation under paragraph (1) applicable with respect to such individual—

(A) for a taxable year ending in 1963, shall be increased by an amount equal to the amount of such compensation so received during such taxable year;

(B) for a taxable year ending in 1964, shall be increased by an amount equal to two-thirds of such compensation so received during such taxable year; and

(C) for a taxable year ending in 1965, shall be increased by an amount equal to one-third of such compensation so received during such taxable year.

[12] In point of fact, petitioner herself allocated a portion of such expenses attributable to those facilities as personal and excluded them from the deductions claimed on her return.

has any applicability with respect to the excludable gross income of sole proprietors.

We now turn to the deduction side of the section 911 computations. The governing provision is contained in section 911(a) and reads as follows:

> An individual shall not be allowed, as a deduction from his gross income, any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this subsection.

Petitioner first asserts that, since earned income should be determined by equating reasonable compensation with the amount she would have paid others to perform her services, nondeductible expenses allocable to earned income should only be those that such hypothetical other employees would have incurred. Since, according to petitioner, they would have incurred none of the expenses claimed by petitioner as a proprietor of a service-capital business, the excluded income should not be charged with any such expenses. Our rejection of the "employee approach" in respect of income disposes of this argument. The invalidity of petitioner's position is further revealed by the fact that such an approach, an exclusion from income without any disallowance of expenses, would produce a tax loss in excess of petitioner's actual loss.[13]

Petitioner next focuses on the statutory language disallowing deductions "allocable to or chargeable against" excludable income and argues that such language requires an item-by-item analysis of each farm expense to determine which expenses are definitely related to, or identified with, earned income. In this vein, petitioner takes the position that only four types of her farm expenses bore the requisite factual relationship to her personal services. Of these four expenses (motor car expense, motor car depreciation, travel and entertainment, and periodicals), petitioner claims only one-third of the costs was attributable to her personal services and the balance was attributable to her employees.

While it is true that a good portion of petitioner's total farming expenses appears to be capital-related (e.g., feed, seed,

---

[13] This result would not obtain where it was possible to conclude that there were hypothetical employee expenses in an amount at least as great as the amount of excluded gross income.

saddlery, repairs, etc.), the nature of this service-capital business is such that even these expenses are related to earned income since without them earned income could not have been realized. See *George Rousku,* 56 T.C. 548, 552 (1971); *Fred J. Sperapani,* 42 T.C. 308, 334 (1964).[14] Moreover, disallowed deductions are statutorily keyed to "amounts excludable from gross income," not to the personal services rendered per se, so that the standard urged by petitioner has no statutory foundation. In fact, petitioner's argument seeks to impart a definite identification of expenses with personal services on the deduction side, although, as petitioner herself recognizes, the assignment of a portion of receipts to personal services on the income side is not based upon any definite identification of a particular item of gross income with the rendition of personal services.[15]

Petitioner attempts to attach some special significance to the words used by Congress in disallowing expenses "allocable to or chargeable against" excluded income in section 911(a). She argues that these words require the disallowance of only those expenses as to which there is a definite factual relationship to her services, with all other expenses to be allowed as deductions, and that, had Congress intended to disallow expenses in the same ratio that excluded income bears to gross foreign-source income, as respondent has done, it would have instead chosen the word "apportionment." We see no reason to conclude that Congress intended that the standard to be applied on the deduction side of section 911 should operate in such a beneficial fashion for the taxpayer. Indeed, if petitioner's interpretation is correct, it can be argued that she has read the word "allocate" out of the statute, since the existence of a definite factual relationship would seem to be encompassed within the phrase "chargeable

---

[14] See also *Frieda Hempel,* a Memorandum Opinion of this Court dated June 23, 1947, in which all expenses of a business where capital was not a material income-producing factor were chargeable against earned income, although some of the expenses were of the type petitioner herein would allocate solely to capital (e.g., office supplies, managerial and secretarial expenses, etc.).

[15] We do not accept petitioner's suggestion that the comment of the Court of Appeals for the District of Columbia in the prior *Brewster* case (see 473 F.2d at 164 n. 6) requires an item-by-item analysis. That comment was made in the context of a stipulation in which the parties agreed as to which expenses were deductible and which were not, a situation which does not obtain herein.

against." Cf. *Carstairs v. United States,* 75 F.Supp. 683, 685 (E.D. Pa. 1936).

Nor are we disposed to engage in a semantic exercise so as to divine shadings of legislative intention based on the use of the word "allocation" rather than "apportionment." It is of some significance that the dictionary defines "allocation" in terms of "apportionment." See Webster's Third New International Dictionary (Unabridged) (1965). Whatever may be the interpretation of these words in other sections of the Code,[16] we are not persuaded that we should adopt a narrow interpretation of the phrase "allocable to or chargeable against" used in section 911. Cf. *Carstairs v. United States, supra.* In this connection, we note that, as in the case of petitioner's first argument relating to her deductions (see p. 362, *supra*), her "allocation vs. apportionment" theory could produce entitlement of a taxpayer to a loss in excess of the actual loss.[17]

We see no reason to construe a provision of the Code excluding amounts from gross income in a fashion so favorable to the taxpayer when the language of the provision does not compel this result. Perhaps there will be situations where the deductible items can be sufficiently identified as solely capital-related so as to justify the conclusion that they should not be disallowed under section 911(a). But such is not the case herein and consequently we sustain respondent's use of an allocation of 30 percent of expenses (except with respect to 1963, see p. 355 and n. 4, *supra*) to petitioner's excludable earned income. Here again we are constrained to note, as we did on the income side, that we are not putting our stamp of approval on the unvarying use of a percentage figure, much less a uniform 30 percent, on the deduction side, although we recognize that, in the usual situation, the use of the same

---

[16] E.g., secs. 861 and 862 and the regulations thereunder, which were dealt with on a basis seemingly favorable to the taxpayer in *F. W. Woolworth Co.,* 54 T.C. 1233, 1269 et seq. (1970), although we are constrained to note that respondent had the burden of proof. See 54 T.C. at 1264.

[17] Assume total gross income of $1,000, expenses of $1,500, of which only $100 are clearly identified with earned income. On the basis of a 30-percent exclusion from gross income, the taxpayer would report $700 of gross income and, under petitioner's theory, would be entitled to deduct $1,400. This produces a tax loss of $700, although the actual loss is only $500.

percentage on the income and deduction sides is likely to be appropriate.

Perhaps because petitioner recognizes that her first two theories could produce situations where the deductible loss for tax purposes would exceed the actual loss, she makes a still further argument that in no event should the amount of the disallowed deductions exceed the amount of excluded earned income. The basis for petitioner's contention is that such an approach is all that is necessary to avoid the double tax benefit against which the deduction provision in section 911 was presumably directed. Clearly there is no language in the statutory provision which provides any basis whatsoever for importing the suggested limitation. Moreover, the arithmetic of petitioner's proposal is such that it eliminates the same dollar amount on the income side and deduction side, thereby producing the same loss as is produced by using the gross figures on both sides. Obviously, adoption of such a proposal would render entirely nugatory the prior decision in *Anne Moen Bullitt Brewster, supra*. It is no doubt for this reason that the Court of Appeals specifically rejected this position, although such rejection can arguably be characterized as dictum. See 473 F.2d at 164 n.6.[18]

Respondent determined that the amount of gross farm expenses to be disallowed is—

$$\frac{\text{Excluded earned income}}{\text{Gross farm income}} \times \text{Gross farm expenses}$$

Petitioner argues that even if this formula is correct, the amount of gross farm expenses to be plugged in should not include an amount attributable to gain from the sale of horses.[19] Petitioner reasons that because such gain, subject to

---

[18] Moreover, the allowance of excess deductions (which is the other side of the same coin) was specifically rejected in *Frieda Hempel* (n. 14 *supra*). Compare also the discussion in *Ivor Cornman*, 63 T.C. 653, 660 (1975), with respect to the failure to obtain legislative sanction of this position in connection with excess deductions related to tax-exempt income under sec. 265.

[19] Petitioner also argues that the gross expenses should be reduced by expenses attributable to horserace winnings. It would appear that this argument is addressed to an error in respondent's deficiency notice calculations which netted gross race winnings and expenses. Respondent has conceded his error in this regard and the necessary corrections are reflected in the figures shown in our findings of fact. See pp. 354–355, *supra*. It would appear that this disposes of petitioner's contention in respect of this item.

Although this adjustment results in the disallowance of more expenses than were

beneficial capital gain treatment under section 1231, was not included in the gross farm income for purposes of computing earned income, no part of the expenses attributable to the horses sold should be disallowed as being allocable to the excluded earned income. Because petitioner cannot identify the expenses relating to the horses sold, which she would insulate from the proportional disallowance, she seeks to accomplish her objective by arguing that the amount of section 1231 gain realized each year should be added to the amount of gross farm income used by respondent in the denominator of the fraction previously noted.

The fact that the amount of such gain was not treated as part of gross income for purposes of computing excludable earned income is of no relevance in light of our rejection of the mechanical application of any percentage of gross income in arriving at such computation and our conclusion that petitioner has failed to carry her burden of proof that the *amount* excluded did not represent "reasonable allowance as compensation for [petitioner's] personal services."

As for petitioner's contention that a certain portion of her gross farm expenses should be immune from the operation of the disallowance because a portion of such expenses was attributable to horses sold, we disagree. On her tax returns, petitioner offset the gain from such sales with expenses clearly identifiable therewith (e.g., commissions). Other expenses relating to such horses were basically breeding, racing, or maintenance costs and the fact of the matter is that petitioner maintained many, if not all, of the horses sold for breeding and racing, activities generating ordinary gross farm income through the combination of capital input and petitioner's personal services. Compare *Mark Tobey, supra; George Rousku, supra.* Thus, we find no basis for adjusting respondent's formula (either by directly reducing the gross farm expense element or by increasing the gross farm income denominator, with a consequent reduction in the amount of expenses disallowed) to reflect the fact that some of peti-

---

disallowed in the notice of deficiency, it also results in the exclusion of more income. Thus, but for the operation of the dollar limitation on earned income in 1963, respondent's adjustment, like his deficiency notice, results in the same amount of reduction of petitioner's claimed losses. For 1963, the reduction in petitioner's allowable loss is less than that in the deficiency notice.

tioner's ordinary farm expenses related to horses eventually sold.

It cannot be gainsaid that the legislative and judicial situation relating to the treatment of earned income abroad is far from satisfactory. It has, as the Court of Appeals for the District of Columbia has observed in its opinion in the prior *Brewster* case, produced "certain incongruities" and a condition which "is not welcomed." See 473 F.2d at 163–164. Any remedy of such "incongruities" and "unwelcome condition" must, in our opinion, emanate from the Congress.

Reviewed by the Court.

*Decision will be entered under Rule 155.*

STERRETT and QUEALY, *JJ.,* did not participate in the consideration and disposition of this case.

HALL, *J.* concurring: I agree with Judge Goffe on the merits but think *Golsen* requires a decision for respondent.

GOFFE, *J.,* dissenting: I respectfully dissent. The majority opinion is cast in terms of exclusions from gross income but the end result is to deny the full losses petitioner sustained in the operation of her farm. This result is produced by holding that *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), precludes examination of our prior decision and requires a decision in favor of respondent.

Our holding in *Jack E. Golsen, supra,* recognized that if a party losing a case in the Tax Court appealed to a Court of Appeals which previously held a position contrary to ours, that he would win on appeal. Therefore, in the interest of efficient and harmonious judicial administration we held that in such instances we would apply the holding of that Court of Appeals. We stated that "We shall remain able to foster uniformity by giving effect to our own views in cases appealable to courts whose views have not yet been expressed, and, even where the relevant Court of Appeals has already made its views known, by explaining why we agree or disagree with the precedent that we feel constrained to follow." 54 T.C. at 757. *Golsen* involved a position of the Court of Appeals that arose from an appeal from the District Court

not the Tax Court. *Golsen* requires us to follow the position of the Court of Appeals for the circuit in which the taxpayer resided at the time he filed his petition in the Tax Court. All appeals from cases initiated in the Tax Court by United States citizens residing abroad lie in the United States Court of Appeals for the District of Columbia. If the *Golsen* rule is applied to the instant case, therefore, a whole class of taxpayers (U.S. citizens residing abroad), are precluded from having us reexamine our holding in the first *Brewster* case unless such taxpayers pay the tax and sue in the Court of Claims or unless they change their residence to the United States, except to the District of Columbia. The *Golsen* rule is solely a rule of law of the Tax Court. It is not etched in stone. It has been neither commended nor criticized by a Court of Appeals or the Supreme Court. It has never been extended to apply to the same taxpayer. Application of the *Golsen* rule in this case makes our prior opinion virtually "review-proof." I conclude, therefore, that *Golsen* should not compel a decision for respondent but we should, instead, freely examine our holding in the first *Brewster* case. Moreover, the recent holding of the Court of Claims in *Vogt v. United States,* 537 F.2d 405 (Ct. Cl. 1976), severely undermines the rationale of our prior *Brewster* decision and that of the Court of Appeals in the first *Brewster* case.

The majority in the instant case disallows 30 percent of petitioner's deductions from the operations of her farm in Ireland under section 911(a) of the Code. This section is not a general section of the Code. It provides only for disallowance of deductions *properly allocable to or chargeable against amounts excluded from gross income.* The sole purpose of disallowing deductions so "allocable or chargeable" is to prevent a double benefit; i.e., excluding the income and deducting the expenses relating to such income. There is no statutory prohibition against offsetting foreign deductions against income from U.S. sources. Even the majority permits petitioner to offset the remaining 70 percent of her Ireland farm deductions against income from U.S. sources.

The disallowance of petitioner's deductions comes about by *requiring* petitioner to exclude 30 percent of the *gross* income from operations of her farm in Ireland. On her returns petitioner excluded no income from the operation of the farm

because it operated at a loss. In the first *Brewster* case we held that she *must* exclude 30 percent of the *gross* profits from the farm although section 911(b) *allows* an exclusion not to exceed 30 percent of *net* profits. The exclusion is designed to permit a U.S. citizen residing abroad to exclude from income a portion of the net income from a trade or business attributable to the personal services rendered by such a taxpayer as distinguished from the portion of net income produced by invested capital. We held in the first *Brewster* case that the 30-percent limitation on the amount of income excludable was applicable only if there were net profits from the business; because there were only losses, not profits, the limitation did not come into play; and, therefore, petitioner must exclude 30 percent of *gross* profit. Accordingly, under section 911(a), we required that a portion of petitioner's deductions be disallowed (the amount to be disallowed was stipulated in the first *Brewster* case but not in the instant case).

The exclusion provided in section 911(a) is for "earned income" as that term is defined in section 911(b). The definition of earned income which is embodied in section 911(b) originated in the Revenue Act of 1924. It had nothing to do with income earned from foreign sources but, instead, was defined in order to impose a lower rate of tax on all earned income. Sec. 209(a)(1), Revenue Act of 1924, ch. 234, 43 Stat. 263, 264. The limitation was enacted to facilitate administration of the Act. H. Rept. No. 179, 68th Cong., 1st Sess. (1924), 1939–1 C.B. (Part 2) 241, 245. S. Rept. No. 398, 68th Cong., 1st Sess. (1924), 1939–1 C.B. (Part 2) 266, 281; 65 Cong. Rec. 2850. The concept of earned income as distinguished from income derived from invested capital in the case of unincorporated businesses resulted from a floor amendment to the bill designed to aid farmers (as is petitioner here) and small businessmen. 65 Cong. Rec. 2849. The application of the "earned income" concept to exclude income earned outside the U.S. was first enacted in the Revenue Act of 1926. Sec. 213(b)(14), Revenue Act of 1926, ch. 27, 44 Stat. 26. At that time Congress also provided that deductions properly allocable to or chargeable against such excluded income were not allowable (now sec. 911(a)). Although Congress has changed the percentage and has otherwise modified the percentage limitation on exclusion of earned income it has

never expressed the limitation in terms other than as a percentage of *net profits*. The effect of our prior decision, the decision of the Court of Appeals, and now, the majority, is to nullify the language of the percentage limitation when the business suffers a *net loss*. Such an interpretation is erroneous. There is no legislative history to support our prior conclusion. Moreover, it is fundamental in statutory construction to give effect to all of the language of the statute. *Hellmich v. Hellman*, 276 U.S. 233 (1928); *Larkin v. United States*, 78 F.2d 951 (8th Cir. 1935); *Stanford v. Commissioner*, 297 F.2d 298, 308 (9th Cir. 1961); *William C. Stolk*, 40 T.C. 345 (1963), affd. per curiam 326 F.2d 760 (2d Cir. 1964).

The limitation of 30 percent of net profits should be applied in all cases, regardless of the existence of net profits. Therefore, applying the limitation literally, to a net loss as we have here, 30 percent of zero is zero and the limitation of section 911(b) precludes exclusion of any portion of petitioner's income as "earned income." Because no income is excluded, no deductions are disallowed under section 911(a). Moreover, our interpretation in the first *Brewster* case is not consonant with the taxation of proprietorships generally; i.e., no income is realized by virtue of the efforts of the proprietor unless a net profit results.

In the first *Brewster* case the Court of Appeals held that the statutory concept of "earned income" was structured in terms of gross income not net profits. *Brewster v. Commissioner*, 473 F.2d 160, 162 (D.C. Cir. 1972). That conclusion has since been rejected by the Court of Claims. *Vogt v. United States*, 537 F.2d 405 (Ct. Cl. 1976). That case involved the method of computing the amount excludable from income under section 911(a) received from a partnership which operated outside the U.S. It did not involve an allocation between the income attributable to the taxpayer's personal services and the income attributable to the invested capital but, instead, whether the dollar limitation on the amount excludable applied to the partner's distributive share of the gross profit of the partnership or its net profit. Relying in part on our decision in *Warren R. Miller, Sr.*, 51 T.C. 755 (1969), the Court exhaustively examined all of the interpretations of section 911 and concluded that the taxpayer demonstrated that there was a long-standing administrative interpretation that a

partner's "earned income" from a partnership is his share of *net* profits. The *net* profits concept, so aptly explored by the Court of Claims, in the partnership context should apply here to a sole proprietorship. In both cases a taxpayer includes in his gross income his *net* profit from a proprietorship or his distributive share of the profits of a partnership (except for items upon which the Code imposes limitations). By the same token, he deducts the *net* loss of his sole proprietorship or his distributive share of the *net* loss of the partnership.

The *net* profits concept is the only rationale that is consistent with taxation generally. Requiring petitioner to exclude 30 percent of the *gross* profits of the proprietorship is not consistent with the general scheme of taxation of sole proprietorships or partnerships. Expression of the exclusion in terms of an exclusion from gross income in section 911(a) does not make the exclusion a gross income concept. It merely identifies the point in the computation of the taxpayer's overall tax liability at which the exclusion applies. All exclusion provisions are expressed in terms of exclusion from gross income.

The reliance by the Court of Claims on *Warren R. Miller, Sr., supra,* requires an examination of our holding in that case. We had before us the meaning of the term "earned income" for purposes of reduction of retirement income in connection with the retirement income credit. We were called upon to interpret that term as it is used in section 911(b), the identical section involved herein. We thoroughly analyzed the term and concluded that earned income was keyed to *net* profits, not *gross* profits. 51 T.C. at 762. In the first *Brewster* case we admitted that *Miller* "gave us pause"; however, we dismissed petitioner's contention that *Miller* applied by pointing out that in *Miller* we were coordinating two sections of the Code which we were not doing in *Brewster.* That is a distinction without a difference. Section 37, which allowed the retirement income credit, incorporated by reference section 911(b). We may have so lightly dismissed our prior interpretation of section 911(b) in *Miller* when we decided the first *Brewster* case but the Court of Claims considered it viable enough to quote from our *Miller* opinion in its opinion.

I conclude that our interpretation of "earned income" in section 911(b) as being a *net* profits concept as fully developed

in *Miller,* was correct as is the opinion of the Court of Claims in *Vogt,* relying on *Miller,* and we erred in holding to the contrary in the first *Brewster* case which, in turn, led the Court of Appeals in *Brewster* to an erroneous conclusion. I would, therefore, hold that the 30-percent limitation of section 911(b) means exactly what it clearly says without any "court made" limitation; "30 percent of his share of the *net* profits of such trade or business." Applying the unmistakable language of section 911(b) to the "net profits" of petitioner's trade or business; i.e., a net loss, 30 percent of zero is zero and petitioner had no earned income and no deductions should be disallowed under section 911(a).

FEATHERSTON, IRWIN, and WILES, *JJ.,* agree with this dissent.