E. Phillips Oppenheim, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 70408.    Promulgated November 12, 1934.

*Claude W. Dudley, Esq.*, for the petitioner.
*R. N. McMillan, Esq.*, for the respondent.

### OPINION.

Goodrich: Respondent determined deficiencies in income tax of $334.99 for 1928 and $386.35 for 1929. He demands also penalties for delinquent returns amounting to 25 percent of the deficiencies in each of these years, or $83.75 and $96.59, respectively. Petitioner assails the determination of deficiencies as erroneous, but offers no defense against the imposition of the penalties. There is but one issue for our decision in the case, namely, whether sums received by petitioner in accordance with contracts in each of these years are to be treated as earned income in computing credit provided by section 31, Revenue Act of 1928. The facts are not in dispute. The parties filed a stipulation of facts of which a condensed statement here will serve for an understanding of the issue.

Petitioner, an author, is a nonresident alien, residing at Villa Deveron, Cagnes-Sur-Mer, France. In 1922 he entered into a contract with Little, Brown & Co., of Boston, Massachusetts, as publishers, which remained in force and effect throughout the year 1928. On January 19, 1928, the same parties made a new contract which, with certain amendments later made, remained in force and effect throughout the year 1929. The slight differences in the terms of the two contracts are not here material.

Under the contracts petitioner granted to the publishers the exclusive book rights in the United States and Canada " during the full term of the copyrights and all renewals thereof, in all novels by him published ", and agreed to deliver to the publishers the manuscripts of not less than two novels in each year. The publishers agreed to make certain monthly advances to Oppenheim against specified royalties to be paid him from sales of his books, and to publish at least two, and at the most, three, of the novels each year. While both contracts provided that the publishers, in their firm name,

should take out the copyrights in the United States to the books written by petitioner under the agreements, it appears that the copyrights, and renewals thereof, were taken out by petitioner in his own name. No additional rights accrued to petitioner on that account however, nor was his compensation thereby increased.

In 1928 petitioner received as royalties under the contracts, $29,264.11, and in 1929, $30,866.34 (both amounts including the monthly advances). On his returns for 1928 and 1929 he reported the whole of the amounts so received as earned income and, in the computation of his tax liability, deducted credits of $435.99 for 1928 and $421.35 in 1929. These credits respondent has disallowed, having determined that the royalties paid petitioner were not compensation for personal services but represented payments for the use or sale of property, since they arose from the copyrights standing in petitioner's name. Consequently, respondent reduced petitioner's earned income in each year to $5,000, the minimum provided by section 31, Revenue Act of 1928, allowing credits of $43.74 for 1928 and $35 for 1929. That action gives rise to the deficiencies here, and the propriety of that action is the issue.

Since only the classification of the income is in dispute, we need consider only the statutory definition of earned income, which is, " wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered." Probably it is impossible, and we do not attempt, to lay a flat rule as to what may constitute compensation for personal services actually rendered, with respect to an intellectual product. Clearly, the weekly wage paid by a newspaper to a reporter employee whose task is to gather information concerning persons and events, and write it up in printable style, would be.[1] Quite as clearly, the income from the use of an invention, although the whole of the development, patenting, and licensing resulted from the intellect, personal effort and capital of the inventor, would not be.[2] Somewhere in the field between these two extremes must be found for each case the place which fits its facts. Somewhere in that field perhaps a line may be drawn; here we need not attempt to draw it, for, in our view, the income in this case falls well toward the end farthest from compensation for the rendition of personal services.

On brief, petitioner relies heavily upon the decision in *Ingram* v. *Bowers*, 47 Fed. (2d) 925; affd., 57 Fed. (2d) 65. So do we, but with a result opposite to that for which petitioner contends. In that case the issue required determination of the geographical source of

---

[1] See G. C. M. 236, VI-2 C. B. 27.
[2] See *John E. Greenawalt*, 27 B. T. A. 936.

income received by Enrico Caruso from the Victor Talking Machine Co., as royalties paid him upon sales of records without the United States, it being conceded that the singing by Caruso for the manufacture of the records was done in this country. Determination of the source of the income required also a determination as to the nature of it; that is, whether it was income from the use of property or compensation for personal services rendered. The income was held to be the latter, chiefly because the matrices which caught the songs as Caruso sang them and from which the records were made, and the records themselves, were the property of the Victor Co.; and Caruso had no right nor interest in them.

That reasoning is controlling here. Oppenheim owned the copyrights to his book. True enough, as counsel points out, the contracts provided that the copyrights should be taken by the publishers in the firm name. Why that was not done, we are not told; the fact remains that petitioner secured and retained them. A copyright—"the exclusive privilege of printing * * * publishing and vending copies of a literary * * * production"—embraces a number of privileges the use of which may be separately licensed in order to realize the fullest value of the work.[3] One of those rights, "the exclusive book rights" in the United States and Canada, petitioner granted and assigned to Little, Brown & Co. From certain provisions of the contracts we infer that he granted similar rights to publishers in England, and, it may be, to publishers in other countries as well.

The terms of the contracts make it clear that Little, Brown & Co. owned no interest in petitioner's intellectual product. The firm did not employ Oppenheim to write stories for it, nor did it buy the stories. It bought and owned only a license—the right, exclusive within a specified territory, to publish in book form, and so sell, the stories which petitioner wrote. And for that right the publishers agreed to pay Oppenheim an amount to be measured by the book sales. Such payments, clearly, are not compensation for personal services actually rendered.

*Judgment will be entered for the respondent*

---

[3] See I. T. 2735, XII–2 C. B. 131, and citations there given.