MARK TOBEY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1144–70. Filed May 17, 1973.

*Arthur G. Barnett, William Merchant Pease*, and *Meade Emory*, for the petitioner.
*Eugene H. Flood*, for the respondent.

OPINION

DAWSON, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Taxable year | Deficiency |
|---|---|
| 1965 | $10, 283. 89 |
| 1966 | 5, 372. 38 |

In an amended petition the petitioner has claimed overpayments for each of these years.

The issue presented for our decision is whether $25,000 of the petitioner's receipts in each of the years 1965 and 1966 derived from the sale of his paintings while living in Switzerland constituted "earned income" within the meaning of section 911(b), I.R.C. 1954,[1] and thus excludable from gross income and exempt from taxation under section 911(a).

All of the facts are stipulated. We adopt the stipulation of facts and the exhibits attached thereto as our findings. The pertinent facts are summarized below.

Mark Tobey (herein called petitioner) is a citizen of the United States who has resided and maintained a studio in Basel, Switzerland, since 1960. He maintains a house, studio, storage space, and bank accounts in Seattle, Wash., his domicile. His permanent address in the United States for business and tax matters is that of his attorney in Seattle. During 1964, 1965, and 1966, except for three very short visits to the United States, petitioner was physically present in Europe.

Petitioner filed Federal income tax returns on the cash basis for taxable years 1965 and 1966 with the Director of International Operations, Washington, D.C.

Petitioner's profession is that of an artist. He creates paintings, pictures, and drawings using oils, watercolors, ink, pencil, tempera, and chalk on paper, cardboard, canvas, composition board, wood, and other substances. He works at his studios in Basel and Seattle, and creates according to his own inspiration, not in response to buyers' wants or taste.

Petitioner has been honored on many occasions, and his works are widely acclaimed.[2]

---

[1] All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] Petitioner has been presented with awards in the United States and Europe. These awards include the Guggenheim International Award in 1956; the Biennale Venice First Prize for painting from the Commune of Venice in 1958; a retrospective show in the Louvre in 1961; and the Commendeur d' Order des Arts et des Lettres by the French Government in 1968.

Capital in the usual sense was not a material income-producing factor in petitioner's work.

During 1965 and 1966 the petitioner's works—mainly paintings—were sold through galleries in the United States and Europe. In addition, some private sales were made to individual purchasers. Private sales amounted to $22,250 in 1965 and $5,750 in 1966. All of petitioner's works were executed, however, without prior commission, contract, order, or any such prior arrangement.

Petitioner's relationship with the art galleries was that of a principal to his agent. He retained title and ownership in the artworks and delivered them, on consignment, to the galleries. There they were stored and displayed for sale. According to the customary agreement between the petitioner and an art gallery, the gallery was to make space available on specific dates for the public display of his works; petitioner was to have completed the work and have them ready for delivery to the gallery by such dates. As compensation, the gallery retained a portion of the moneys derived from sales—completed or installment sales. Commissions ranged from 30 to 60 percent.

Petitioner's personel work schedule is planned months, sometimes years, in advance, depending upon his commitments to galleries.

In 1965, there were showings of petitioner's works at the Seligman Gallery in Seattle, the Willard Gallery in New York, the Jeanne Bucher Gallery in Paris, and the Alice Pauli Gallery in Lausanne, Switzerland. In 1966, the Martha Jackson Gallery in New York and the Gallery Pierre in Stockholm also held Tobey exhibitions.

The works sold at these exhibitions were created and executed by the petitioner both in the United States and in Europe. The gross amounts received on the sale of works executed at a time when petitioner was physically present in a foreign country are $106,450 for 1965, and $59,956 for 1966. On these amounts he paid commissions of $36,949.98 and $21,113.40, leaving net amounts received of $69,500.02 and $38,842.60. The following information relates to the amounts "received in the United States and Europe" through various bank accounts:

| | Gross sales price | Gallery commission | Net amount to petitioner |
|---|---|---|---|
| *1965 income* | | | |
| Received in United States | $110,750 | $42,969.98 | $67,780.02 |
| Received in Europe | 4,050 | 1,350.00 | 2,700.00 |
| Not identified | 22,250 | | 22,250.00 |
| | 137,050 | 44,319.98 | 92,730.02 |
| *1966 income* | | | |
| Received in United States | 73,821 | 27,955.82 | 45,865.18 |
| Received in Europe | 41,104 | 14,135.00 | 26,969.00 |
| | 114,925 | 42,090.82 | 72,834.18 |

Petitioner paid self-employment taxes of $259.20 and $405.90 on self-employment earnings of $4,800 and $6,600 in 1965 and 1966.

Petitioner paid income tax in Switzerland for the 2 years at issue, and claimed corresponding credits on his U.S. Federal income tax returns.

Petitioner's gross income for 1965 was reported as $147,050. This was overstated by $10,000.

On his Federal income tax returns for 1965 and 1966 the petitioner excluded $25,000 from gross income as earned income from sources without the United States. Respondent determined that the exclusions were improper, recomputed petitioner's tax, and asserted the contested deficiencies.

The disposition of the issue confronting us in this case turns upon whether the amounts received by the petitioner, which were derived from the sales of his paintings, were "earned income" under section 911(b).[3] If so, it is conceded that the portion originally excluded was properly excluded as "income from sources without the United States" in accordance with section 911(a) and (c). There is no question concerning the source of that income.

Petitioner contends that income from the sales of his paintings was received as "compensation for personal services actually rendered" and that the *ratio decidendi* of the recent case of *Robida* v. *Commissioner*, 460 F. 2d 1172 (C.A. 9, 1972), affirming a Memorandum Opinion of this Court, is dispositive of the issue. To the contrary, respondent contends that the income cannot be section 911(b) "earned income" since there were no recipients of petitioner's services, just purchasers of his paintings; that instead the income resulted from the sale of personal property and as such is not earned income (citing Rev. Rul. 71-183, 1971-1 C.B. 215); and that the precedential value of the *Robida* case is severely limited because it involved a rather "bizarre set of circumstances."

In the *Robida* case the taxpayer derived the bulk of his income from the manipulation of slot machines located in various overseas service clubs. He was living abroad within the meaning of 911(a)(2) at the time. The Commissioner argued (1) that the income was gambling

---

[3] Sec. 911(b) provides as follows:

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

gains, not "earned income," but this Court and the Court of Appeals held that he earned the income by applying his personal and unique skills; and (2) that Robida could not have "rendered services" to anyone because there was no person other than himself who received his services, but the Court of Appeals termed this argument "semantic haggling." "Congress," it said, "meant income derived from labor, broadly defined, to be earned income and income derived from the use of property not to be earned income for the purposes of § 911." *Robida* v. *Commissioner, supra* at 1175. The Court of Appeals went on to say: "The key element is the presence or absence of capital as the income-producing factor, not the existence or nonexistence of an independent recipient for the personal services rendered by the taxpayer." And earlier in its opinion the Court of Appeals said (460 F. 2d at 1174):

The distinction Congress created is between income which is earned and income which is not earned. Congress made it clear when it devised the definition for earned income that it meant to include all income not representing return on capital. *See* H.R. Rept. 179, 68th Cong., 1st Sess., 1924, reproduced in Internal Revenue Cum. Bull., 1939–1, part 2, pp. 245–46. Income which accrued to the individual from application of his personal skills, whether received in the form of wages, salaries, professional fees or otherwise, was intended to be "earned" income. Income which accrued to the individual as return on capital was not considered "earned." The tax court labeled the two as *active income* ("income derived from the use of the taxpayer's personal expenditure of time, energy and skill") and *passive income* ("income derived from the use of his property").

As we see it, the decision of the Court of Appeals disposes of respondent's "recipient" argument and goes a long way towards categorizing petitioner's income in this case. Notwithstanding respondent's attack on the *Robida* decision, its normal precedential vitality exists.

Respondent seeks to distinguish *Robida* by pointing out that no product resulted from Robida's labors as it did from the petitioner's. However, the reasoning underlying the decision in *Robida* was not pinned to this point. The "key," as previously noted, was the absence of capital as an income-producing factor. In the instant case it is stipulated that capital was not a material income-producing factor. Furthermore, the legislative history of the definition of "earned income" clearly indicates that the distinction between "earned income" and other types of income is essentially the distinction between income derived from the taxpayer's personal expenditure of time, energy, and skill, and income derived from the use of his property.[4] We adhere to

---

[4] The definition of earned income in sec. 911(b) originally appeared in sec. 209 of the Revenue Act of 1924, 43 Stat. 263–264, which provided for an earned-income credit benefiting the working man. When the earned-income exclusion for citizens living abroad entered the Code in 1926, as sec. 213(b)(14) of the Revenue Act of 1926, the definition of earned income was supplied simply by referring to the definition already existing in the earned-income-credit provision. When that credit was repealed in 1943, the definition was

the view that the "earned income" requirement was designed merely to prevent the exclusion of passive income, such as rental income, interest, and dividends.[5] If Congress had intended the existence of a *product* of personal efforts to be fatal, it would not have provided, as it did in the last sentence of 911(b), for a minimum allocation of a stated percent of net profits to personal services where both personal services and capital are income-producing factors, since such businesses often result in the production of a tangible product, as in farming. We think Congress was well aware of the definitional problems latent in this area and it deliberately chose a broad approach to the meaning of "earned income." [6]

Respondent argues that in place of *Robida* we should apply *Ingram v. Bowers*, 57 F. 2d 65 (C.A. 2, 1932), affirming 47 F. 2d 925 (S.D. N.Y. 1931) ; *John E. Greenawalt*, 27 B.T.A. 936 (1933) ; *E. Phillips Oppenheim*, 31 B.T.A. 563 (1934) ; and *Frank L. Kluckhohn*, 18 T.C. 892 (1952). In our *Oppenheim* opinion (31 B.T.A. at 564) we pointed out:

Probably it is impossible, and we do not attempt, to lay a flat rule as to what may constitute compensation for personal services actually rendered, with respect to an intellectual product. Clearly, the weekly wage paid by a newspaper to a reporter employee whose task is to gather information concerning persons and events, and write it up in printable style, would be.[1] Quite as clearly, the income from the use [n.b., not the sale] of an invention, although the whole of the development, patenting, and licensing resulted from the intellect, personal effort and capital of the inventor, would not be.[2] Somewhere in the field between these two extremes must be found for each case the place which fits its facts. * * * [Fns. omitted.]

While the instant case falls somewhere between the "two extremes" mentioned in *Oppenheim*, we think it is significant that the earlier cases did not present the full spectrum of the legislative history defining what is "earned income." Consequently, to the extent that the rationale of *Oppenheim* and *Kluckhohn* conflicts with the views expressed herein, we will no longer follow them.

---

lifted from the then-defunct credit provision and inserted in the foreign-earned-income provision. In the 1928, 1932, 1934, 1936, 1938, and 1939 Revenue Acts the definition continued to reside in the foreign-earned-income section, sec. 116(a). In 1954 the section number changed to 911(b).

For support of our characterization of the legislative history of the term "earned income," see H. Rept. No. 179, 68th Cong., 1st Sess., pp. 5–6 (1924) ; S. Rept. No. 398, 68th Cong., 1st Sess., pp. 7–8 (1924) (wherein the distinction is drawn between income derived from capital and income that is the result of personal efforts) ; Hearings before the Committee on Ways and Means on Revenue Revision, 68th Cong., 1st Sess., pp. 217–218 (1924) (statement of Congressman Burtness).

[5] See our supplemental opinion in *Daniel A. Robida*, T.C. Memo. 1970–86.

[6] H. Rept. No. 179, 68th Cong., 1st Sess., p. 6 (1924), states:

"Recognizing the impossibility as an administrative matter of accurately defining earned income, the committee adopted a definition which will give relief to practically all of the earned income and which at the same time will be simple of administration."

Next, respondent argues that we should follow G.C.M. 236, VI-2 C.B. 27 (1927). There the General Counsel was presented with the question whether royalties paid to authors by publishers constitute "earned income." In his ruling it was first assumed, without discussion, that consideration paid for the sale of—as well as to rent or to lease—a literary work did not constitute "earned income." [7] He then went on to state: "The question whether an author sells, leases, or rents his intellectual product to a publisher depends upon the terms of their contract." He ruled that where an author sells, rents, or leases his property rights in a work and his publisher agrees to copyright, advertise, publish, and market the work and to pay royalties to the author, the royalties "are not paid for 'personal services actually rendered,' but are paid for the use or sale of property" and thus are not "earned income." On the other hand, where an author contracts with a newspaper to write articles on a regular basis or with a publisher to write a book on a certain subject, the newspaper or publisher to copyright the work and pay the author a stipulated amount, or a stipulated amount plus a percentage of the sales proceeds, the income received by the author is paid for "personal services actually rendered" and thus is "earned income." In such a case there exists an employer-employee relationship; consideration paid is for the employee's personal services. The literary work usually belongs to the employer, and the author has no property rights in it. We reject this ruling here because it has no basis in any pertinent provision of the statute or in the relevant legislative history. It places too much emphasis upon the phrase "for personal services actually rendered" and ignores the distinction between income derived from the taxpayer's personal efforts and income that represents a return on capital. [8]

Respondent took a similar position with regard to "earned income" under section 401(c)(2)(A) and (B), relating to self-employed individuals' retirement plans, prior to amendment of that provision in 1966. Section 401(c)(2)(A) had provided: "The term 'earned income' means the net earnings from self-employment * * * to the extent that

---

[7] No authority is cited for the placing of "the sale of property" in the same boat as "the use of property."

For additional rulings, see I.T. 2181, IV-2 C.B. 29 (1925) (obsolete); Rev. Rul. 291, 1953-2 C.B. 47 (which speaks of "gains or profits from dealing in real or personal property"); Rev. Rul. 54-105, 1954-1 C.B. 12 (which concerns the sale of personal property that is not the product of the seller's personal efforts, such as automobiles and television sets); Rev. Rul. 55-636, 1955-2 C.B. 17 (concerning sec. 37).

[8] Respondent also points to the language in a sec. 170 case, *John R. Holmes*, 57 T.C. 430 (1971). See also *Bernard Goss*, 59 T.C. 594 (1973). Both of these cases dealt with the question whether certain items—films and essays—constitute "property" or "services" for purposes of the charitable contribution deduction. Sec. 1.170-1(c)(1) and 2(a)(2), Income Tax Regs. The statutory matrix in which those cases were decided, however, differs greatly from the context in which this case must be decided.

such net earnings constitute earned income (as defined in section 911 (b) * * *)." When respondent's administrative rulings were specifically brought to the attention of Congress, it amended section 401(c)(2) by deleting old subparagraphs (A) and (B), and adding new subparagraphs (A) and (C). Section 401(c)(2)(C) now clearly states that the term "earned income" includes gains and net earnings "derived from the sale or other disposition of, the transfer of any interest in, or the licensing of the use of property * * * by an individual whose personal efforts created such property." The reason for the amendment is explained in S. Rept. No. 1707, 89th Cong., 2d Sess., pp. 62–63 (1966), as follows:

Present law contains provisions designed to encourage self-employed persons to establish voluntary retirement plans. Under these provisions, self-employed persons are permitted to deduct contributions (within specified limits) made to pension or profit-sharing plans for the benefit of themselves and other employees covered by the plan.

Coverage under these provisions depends on "earned income," and such income is the basis for computing deductible contributions. This term includes professional fees and other compensation for personal services from a trade or business (but does not include amounts which constitute a return on capital invested in the trade or business).

With respect to authors, the Internal Revenue Service takes the position that if an author contracts to write articles for a given period or a book for a publisher who copyrights the literary material and pays the author a stipulated amount of cash, plus a percentage of the income derived from the material, the consideration is for the author's personal services and constitutes earned income. However, where the consideration received by an author is derived either from the sale, leasing, or renting of the author's writing, the consideration is paid for the use or sale of property and is held not to constitute earned income. A similar position is taken by the Service with respect to inventors and others who create property through the application of their personal efforts.

The effect of these positions of the Internal Revenue Service is to curtail, or possibly deny entirely, the tax advantages of the self-employed individuals retirement plan provisions if the taxpayer is an author, inventor, and so forth. *The intent of the Congress in adopting the "earned income" concept was to limit the applicability of these provisions to the portion of a self-employed person's income which was a result of his individual efforts as distinguished from a return on capital. Your committee does not believe that for this purpose the classification of income from an author's writing (or an inventor's invention), which is so clearly a result of his individual efforts, as "earned" or not "earned" should depend upon the terms of the contract under which the author (or inventor) is to be compensated.*

For the above reasons, the bill amends the self-employed individuals retirement plan provisions to provide that "earned income" includes gains (other than capital gains) and net earnings derived from the sale or other disposition of, the transfer of any interest in, or the licensing of the use of property (other than good will) by an individual whose personal efforts created the property.

[Emphasis added.]

This is an explicit rejection by Congress of respondent's approach to the definition of "earned income" in this case. It is plain that the character of the income does not depend upon a mechanical reading of the terms of a contract or upon the existence or nonexistence of an end product—which is, after all, an arbitrary criterion. In our opinion the character of the income for the purposes of section 911 depends upon what the taxpayer does and where he does it. If the taxpayer's personal efforts result in the creation of personal property, the gain derived from the sale of that property is properly categorized as "earned income." [9]

In this case the respondent has created a colorful fabric of definition and illustrations to enhance his argument that the petitioner is making "products" rather than producing "earned income" by his personal efforts in creating his paintings. We view this argument as untenable. The law, as reflected in the legislative history and as enunciated in the *Robida* case, clearly supports the petitioner's position that personal efforts constitute a basis for earned income. No recipient or prior contract is needed.

The concept of the artist as not "earning" his income for the purposes of section 911 would place him in an unfavorable light. For the most part, the present-day artist is a hard-working, trained, career-oriented individual. His education, whether acquired formally or through personal practice, growth, and experience, is often costly and exacting. He has keen competition from many other artists who must create and sell their works to survive. To avoid discriminatory treatment, we perceive no sound reasons for treating income earned by the personal efforts, skill, and creativity of a Tobey or a Picasso any differently from the income earned by a confidence man, a brain surgeon, a movie star or, for that matter, a tax attorney.

We conclude that since the paintings were the result of petitioner's personal efforts, the income derived from their sales was "earned income" within the ambit of section 911(b) and is excludable from gross income to the extent of $25,000 per year under section 911(a).

Petitioner has claimed overpayments of $5,517 for 1965 and $7,040.82 for 1966. As to the first amount, it is stipulated that the petitioner overstated his gross income for 1965 by $10,000. The correct amount of the overpayment can be determined in the Rule 50 computation. The latter amount represents the balance of an excess of tax credits totaling $13,582.46 appearing on petitioner's 1966 income tax return. Instead of

---

[9] The words "earned income" commonly denote some kind of labor. The statutory definition "compensation for personal services actually rendered" also has a common meaning. It means income from one's work. The common emphasis is not on the *source* of the income, but on the fact that it results from one's work.

refunding the $7,040.82 as requested, respondent awaited the audit, disallowed the section 911 exclusion, determined the deficiency, and in effect credited the claimed amount. This, too, can be determined in the Rule 50 computation.

Reviewed by the Court.

*Decision will be entered under Rule 50.*