[redacted]

**Robert H. COOK and Joan M. Cook**

**v.**

**The UNITED STATES.**

**No. 442–75.**

United States Court of Claims.

April 18, 1979.

On Rehearing July 9, 1979.

[redacted]

Arthur G. Barnett, Seattle, Wash., attorney of record, for plaintiffs; Peter S. Lewicki, Seattle, Wash., of counsel.

Michael J. Dennis, Washington, D. C., with whom was Asst. Atty. Gen., M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DAVIS, Judge:

This case revolves around the application of the foreign-income exclusion provided by section 911 of the Internal Revenue Code, 26 U.S.C. § 911, to the work of an American artist residing and creating abroad. Plaintiff Robert H. Cook, a United States citizen, is a sculptor, long-resident in Rome, Italy, who works in bronze.[1] Essentially, he uses a lost wax process, making a model of the sculpture in beeswax reinforced by strips of bamboo. The model is then taken to an outside foundry where it is cast in bronze. Mr. Cook creates his sculptures in his studio in Rome, and then sells them on a noncommissioned or a commissioned basis, primarily to persons in the United States.[2] In the two taxable years now in question, 1970 and 1971, plaintiff had both commissioned and noncommissioned sales; the commissioned work was a large bronze sculpture, commissioned in 1970 by Mr. Jack Rudin for placement in New York and delivered there in 1971, for a total price (including foundry expenses) of $65,000.[3]

---

1. Plaintiff Joan M. Cook, his wife and also a U.S. citizen, is a party only because the couple filed joint income tax returns for 1970 and 1971, the taxable years. We shall refer to Mr. Cook as the taxpayer or plaintiff.

2. Noncommissioned sales are those made after the sculpture is completed, usually but not al-

ways from art galleries where the works are displayed and placed on sale. Commissioned sales are ordered in advance by the purchaser and then created "to order."

3. Taxpayer received payments on the Rudin commission in both 1970 and 1971.

For both 1970 and 1971 taxpayer's income tax returns excluded part of his income as foreign earned income under section 911 of the Code. On audit, the Internal Revenue Service disallowed portions of the claimed foreign income exclusion and increased plaintiff's tax liability. The Service made its recomputation mainly on the basis that Mr. Cook was not entitled to a section 911 foreign "earned income" exclusion for his noncommissioned sales in the United States (which were sold to purchasers in this country, usually through art galleries, after full completion of the sculpture in Italy). The Service's position at that time was that these noncommissioned sales were sales of tangible products, rather than the result of personal labor or services.

Taxpayer paid the additional amounts found due by the Service, and then filed timely refund claims for both years. These claims stated that in light of the Tax Court's decision in *Tobey v. Commissioner,* 60 T.C. 227 (1973) *acq.* 1979–10 I.R.B. at 6,[4] taxpayer's returns for the respective years should have been accepted as filed. The refund claims were disallowed (except for a small mathematical adjustment for 1970) and this suit was then brought. Both parties have moved for summary judgment, on the basis of stipulated facts and affidavits, and we believe that the case can properly be disposed of on the materials we now have before us.

### I.

At the center of the case is section 911(a), providing for the exclusion of foreign income if three general conditions are satisfied: (1) taxpayer must be either a bona fide foreign resident [§ 911(a)(1)] or physically present abroad for 510 days [§ 911(a)(2)]; (2) the income received must be "from sources without the United States"; (3) the income received must constitute "earned income attributable to services performed" during foreign residency.[5] The parties have stipulated that taxpayer was a bona fide resident of Italy under section 911(a)(1) and also agree that, under the then-existing provisions of section 911(c), taxpayer was entitled to an exclusion of up to $25,000 of foreign income. *See* I.R.C. § 911(c)(1)(B) (1970). Moreover, contrary to the Service's position on the audit, the Government does not now contest the application to plaintiff of the holding in *Tobey v. Commissioner, supra,* that both taxpayer's commissioned and noncommissioned income is earned income under section 911.

4. Holding, in the case of the well-known painter Mark Tobey, that income from noncommissioned sales in the United States was "earned income" (not income from the sale of a product) for the purposes of the section 911 exclusion of foreign "earned income."

5. The then-existing section 911(a) read as follows:

(a) General rule.—

The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) Bona fide resident of foreign country.—

In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this para-

graph for any taxable year shall be computed by applying the special rules contained in subsection (c).

(2) Presence in foreign country for 17 months.—

In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

An individual shall not be allowed as a deduction from his gross income, any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this subsection. 26 U.S.C. § 911(a) (1970).

The currently disputed issues are these: (a) Is taxpayer correct that he is entitled to calculate his net earned income and then deduct his foreign income exclusion of $25,-000? (b) Is the defendant right that a large part of plaintiff's income from his work was not "from sources without the United States"? (c) Is taxpayer bound, because of the nature and wording of his refund claims, by the figures and factual statements set forth in his returns for the two taxable years? and (d) Was capital a "material income-producing factor" for plaintiff's income? In the subsequent sections of this opinion, we answer the first three of these questions, and find it unnecessary to delve into the fourth; we also compute, on the basis of our analysis of the substantive issues taken together with the facts which have to be accepted on these motions, the amount of the taxes owed for each of the two taxable years.

## II.

█ In claiming an exclusion under section 911(a), taxpayer argues that he is entitled to exclude his foreign source income from *net* income. Plaintiff would subtract his business expenses from gross receipts to arrive at a figure labeled "Schedule C Net Earned Income." From this net income figure taxpayer would then subtract his excludable foreign income, without any reduction for expenses allocable to the foreign income.

We reject this attempt to compute an exclusion from net income as contrary to the statute, as it has been implemented by regulations, revenue rulings, and case law. Section 911(a) begins with the statement that "[t]he following items shall not be included *in gross income* and shall be exempt from taxation under this subtitle * * *" (emphasis added). This language, together with the last sentence of section 911(a) (precluding deductions from gross income when such deductions are "properly allocable to * * * amounts excluded from gross income under this subsection") tends to sug-

gest at least for individual taxpayers, that the section 911 exclusion is to be computed on the basis of gross income.[6]

The tilt of the statutory language is strongly reinforced by the interpretative regulations, in effect since 1963, relating to individuals. *See* Treas.Reg. § 1.911–2(a)(1) ("amounts constituting earned income * * shall be excluded from the *gross income* of an individual * * * *") (emphasis added); *id.* at (a)(4) (specifying the maximum amount to be "excluded from the *gross income* of an individual") (emphasis added). *See also* Rev.Rul. 75–86, 1975–1 Cum.Bull. 242 (example number one). The cases which have discussed the section 911 exclusion for individuals also calculate the exclusion from the taxpayers's gross income. *See, e. g., Brewster v. Commissioner,* 154 U.S.App.D.C. 30, 473 F.2d 160 (1972) (per curiam), *aff'g* 55 T.C. 251 (1970); *Tobey v. Commissioner,* 60 T.C. 227 (1973); *Brewster v. Commissioner,* 67 T.C. 352 (1976), *appeal docketed,* No. 77–2010 (D.C.Cir. Nov. 14, 1977).

Against this statutory inference reinforced by consistent administrative and judicial interpretation taxpayer relies on a partnership case, *Vogt v. United States,* 537 F.2d 405, 210 Ct.Cl. 246 (1976), to support his theory that the foreign income should be excluded from net income. Particularly, plaintiff quotes language from *Vogt* which is said to hold that earned income (for purposes of section 911) is not necessarily equivalent to gross income and he argues that a revenue ruling here relied on by the Government, Rev.Rul. 75–86, 1975–1 Cum. Bull. 242, was specifically rejected in *Vogt.* Taxpayer ignores two salient features of *Vogt* that distinguish it from this case. First, that decision involved partners and the suggestion that section 911(a) does not literally compel use in every instance of gross income as the basis for the exclusion was made in the course of an analysis showing that the statutory language was not so clear as to invalidate a long-standing administrative interpretation allowing the

---

6. We recognize that the statutory language is not wholly free from ambiguity. *See Vogt v. United States,* 537 F.2d 405, 409–12, 210 Ct.Cl. 246, 252–57 (1976). See also our discussion of the *Vogt* case *infra.*

foreign earned income exclusions of a partner to be based on his share of the partnership net profit. *See Vogt v. United States*, 537 F.2d 405, 409–17, 210 Ct.Cl. 246, 252–65 (1976). The whole rationale of the *Vogt* opinion was tied to the lengthy existence of that administrative construction for foreign-based partners. Second, *Vogt* parsed the language of section 911 and the post-litigation interpretation contained in Rev.Rul. 75–86 only in terms of partnership income, not individual returns. The decision in *Brewster v. Commissioner*, 154 U.S.App. D.C. 30, 473 F.2d 160 (1972) (per curiam), was specifically distinguished in *Vogt* as involving an individual, not a partnership return. 537 F.2d at 415, 210 Ct.Cl. at 262–63; *see Brewster v. Commissioner*, 67 T.C. 352, 358 n.7 (1976), *appeal docketed*, No. 77–2010 (D.C.Cir. Nov. 14, 1977).

Here, taxpayer is clearly reporting on an individual basis, and has not shown (or even argued) that the Service had any longstanding administrative policy allowing individuals to exclude foreign source income from a net figure. The contrary is clearly true, and there is therefore no reason to reject the facial suggestion of the statute that gross income is to be the starting point.

### III.

A precondition for a section 911 exclusion is that the income received be "from sources without the United States." I.R.C. § 911(a)(1) & (2). Sections 861–864 of the Code provide general rules for determining the source of income, and the regulations interpreting section 911 specifically refer to these provisions for proper allocation of income sources. Treas.Reg. § 1.911–2(c)(4) (1971). Both parties accept reference to the sourcing provisions, but dispute vigorously whether the artwork sold by Cook constituted "labor or personal services" to be governed by the sourcing provisions of sections 861–862 (plaintiff's view) or whether the artwork was a sale of "personal property" to be sourced under section 863 (defendant's view). The Government insists that

taxpayer's sales of sculpture, both commissioned and noncommissioned works, constituted sales of "personal property."

We agree with plaintiff that the rationale of *Tobey v. Commissioner*, 60 T.C. 227 (1973) (reviewed by the court) *acq.* 1979–10 I.R.B. at 6, compels the conclusion that Mr. Cook's sales be deemed "personal services" under the sourcing rules. *Tobey* did not directly deal with the proper sourcing of that artist's income,[7] but only with whether the sale of the work (primarily paintings in that instance) constituted "earned income" under section 911. However, in assessing what was "earned income" *Tobey* considered and rejected the Commissioner's argument that Mark Tobey's art work was a "product," not within the definition of "earned income." The Tax Court noted that section 911 was intended to allow the exclusion of foreign source income derived from personal labor, even if the immediate source of gain was derived from a product incorporating that labor. 60 T.C. at 231–32, 235 & n.9. "If the taxpayer's personal efforts result in the creation of personal property, the gain derived from the sale of that property is properly categorized as 'earned income.'" 60 T.C. at 235. The court summarized its position by stating:

In this case the respondent [the Commissioner] has created a colorful fabric of definition and illustrations to enhance his argument that petitioner is making "products" rather than producing "earned income" by his personal efforts in creating his paintings. We view this argument as untenable. \* \* \* \* The concept of the artist as not "earning" his income for the purposes of section 911 would place him in an unfavorable light. \* \* \* To avoid discriminatory treatment, we perceive no sound reasons for treating income earned by the personal efforts, skill, and creativity of a Tobey or a Picasso any differently from the income earned by a confidence man, a brain surgeon, a movie star, or, for that matter, a tax attorney. 60 T.C. at 235

---

7. No sourcing issue was raised there, possibly because that taxpayer had considerably more than $25,000 in foreign earnings. *See* 60 T.C. at 230.

*See generally, Note,* Robida & Tobey: *The New Test for Section 911 "Earned Income,"* 27 Tax Law. 493, 498–500 (1974) (*Tobey* clearly rejected the "product test" for determining earned income).

To hold now that (as defendant urges) Congress intended to allow an exclusion of foreign-source income earned through personal efforts under 911 but to limit that exclusion by treating the outcome of personal efforts as "personal property" under the sourcing rules would gut the *Tobey* decision and produce an internally inconsistent application of the statutory pattern. In an effort to avoid the implications of *Tobey,* defendant argues that the sourcing rules provide different, narrower definitions of "personal property" and "personal services" than the 1911 use of "earned income." What defendant cannot avoid however, is that an application of the sourcing rules under section 911 which would create an absolute distinction between labor and the tangible results of that labor—a distinction squarely rejected by *Tobey* for section 911 —would be to attribute to Congress an inconsistent and self-contradictory purpose.

■ Furthermore, defendant's reading would create artificial and technical distinctions without genuine substantive foundation. That interpretation of the sourcing rules requires that, after defining the artist's work as "personal property," a second determination be made under state law— where the sale took place. *See* I.R.C.

§ 863(b)(2) (specifying sourcing rule for "personal property" which was produced without and "*sold within* the United States") (emphasis added). Because the Uniform Commercial Code provisions on the sale of goods [8]—normally, the local law— provides generally that unless explicitly agreed otherwise title passes on physical delivery of the goods, *see* U.C.C. § 2–401(2), a well-counseled artist would either arrange to make delivery of his works outside the United States, or specifically allocate passage of title by an event other than delivery. *See* U.C.C. § 2–401(1) (if parties make explicit agreement in contract then title passes under terms of that agreement). The artist would thereby escape defendant's dragnet of the sourcing rules, which apply only to personal property sold or produced "within" the United States.[9] We conclude, for these reasons, that taxpayer is entitled to treat his earnings from his artwork as from "labor or personal services," to be sourced as earned abroad, according to sections 861(a)(3) and 862(a)(3).

IV.

Thus, taxpayer meets three basic conditions for exclusion of income under section 911: he is conceded to be a bona fide foreign resident under 911(a)(1) (part I, *supra*); his income is derived (with the exception of some business days he spent in the United States in 1970) from "without the United States," as demonstrated in part III, *supra*; and his income for both his commissioned and noncommissioned sales is conced-

---

8. Defendant's brief assumes that, if the artist's products are "personal property" under tax sourcing rules, such products are also "goods" covered by Article 2 of the Uniform Commercial Code. However it is far from clear that commissioned or noncommissioned art works were intended to fall within the definition of "goods." *See* U.C.C. § 2–105; 1 R. Anderson, On the Uniform Commercial Code § 2–105:10 (2d ed. 1970) ("Article 2 does not apply to 'service' contracts * * *"); *cf. For Children, Inc. v. Graphics Int'l, Inc.,* 352 F.Supp. 1280, 1283 (S.D.N.Y.1972) (Article 2 held not to control a contract for mechanical design and printing of special children's books). If Article 2 does not govern (a question our disposition of the sourcing issue makes irrelevant), then the issue of passage of title under state law could be far more complex, uncertain, and subject to

more artificial distinctions than even defendant contemplates.

9. The same type of artificial result, depending on the technical provisions of a contract, was also rejected by the Tax Court in *Tobey.* Faced with the Service's attempt in *Tobey* to distinguish between art works created under a contract (for which the Service would allow a 911 exclusion) and art works not created under a specific contract (for which the Service would not allow an exclusion) the court said:

"It is plain that the character of the income does not depend upon a mechanical reading of the terms of a contract or upon the existence or nonexistence of an end product— which is, after all, an arbitrary criterion." 60 T.C. at 235.

ed to be "earned income" under the *Tobey* holding (part I, *supra*). We have also ruled above that the $25,000 foreign income exclusion is to be computed on the basis of taxpayer's gross income (not his net income). *See* Part II, *supra*. But before we can determine the proper tax for 1970 and 1971 we must decide a question bearing directly on the appropriate figures to use—to what extent is taxpayer bound in this court by his original returns.

■ We hold that because of the nature of his refund claims taxpayer cannot now contest the figures and statements in his own returns (though of course the Government can do so). His refund claims twice emphasized that his original returns should be accepted as filed and without adjustment.[10] Nevertheless he seeks in this litigation to change (to his advantage) two major factual aspects of those returns—the number of business days he spent in the United States in 1970 and the amount of commissioned receipts attributable to his foreign income exclusion for 1970. This he cannot do because he is precluded from making any claim in court which is at substantial variance with the refund claims filed administratively.

■ The substantial variance rule is based on section 7422(a) which requires a refund claim to be "duly filed" with the Internal Revenue Service before maintaining a lawsuit for a tax refund. Regulation section 301.6402–2(b) states one of the requirements for a "duly filed" refund claim:

The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. Treas.Reg. § 301.6402–2(b)(1) (1971).

This regulation and its predecessors have long been interpreted as barring a subsequent refund suit which presents claims at "substantial variance" with those presented in the refund claim. *See, e. g., United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931); *Real Estate-Land Title & Trust Co. v. United States*, 309 U.S. 13, 17–18, 60 S.Ct. 371, 84 L.Ed. 542 (1940); *Fruehauf Corp. v. United States*, 477 F.2d 568, 574–75, 201 Ct.Cl. 366, 378–79 (1973). Although many cases (including those cited) found a substantial variance based on a different legal theory argued to the court, the language of the regulation and the objective behind the rule also prevent taxpayers from substantially varying the factual bases of their claims as presented to the Service in their refund claims. *See generally, Union Pacific R.R. v. United States*, 389 F.2d 437, 442, 182 Ct.Cl. 103, 109 (1968) (purposes of rule to prevent surprise; give adequate notice to Service; and allow Service to correct errors and thereby limit scope of contested issues).[11] Here, taxpayer expressly told the Service to accept his returns as filed and without adjustment. That meant that, so far as he was concerned, the Service could and should accept his facts and figures without further inquiry (especially statements as to his own affairs, which he presumably knew). It is no answer that the Government has raised new legal theories in this court to deny recovery. Plaintiff is not barred from re-

---

**10.** The complete text of the refund claim in part II of the 1040X form was identical for both 1970 and 1971 and read as follows:

Tax examiner (Mr. Skorupinski) in Rome did not allow section 911 exclusion on all work performed by taxpayer in Rome. On [*sic*] light of the recent court decision *"Mark Tobey v. Commissioner"* (copy enclosed) the original return filed by the taxpayer should have been accepted without adjustment. Therefore this amended return is to re-file the 1970 and 1971 returns as originally filed (copies enclosed).

**11.** *Union Pacific* said that the requirement of an adequate refund claim

"is designed both to prevent surprise and to give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination. *United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619 (1933). In addition, the Commissioner is provided with an opportunity to correct any errors, and if disagreement remains, to limit the scope of any ensuing litigation to those issues which have been examined and which he is willing to defend." (Citations omitted). 389 F.2d at 442, 182 Ct.Cl. at 109.

sponding to those theories but in doing so he should not depart from the facts stated in his returns which he specifically demanded (in the refund claims) that the Service accept as true.

### V.

In this segment of our opinion, we concern ourselves with the proper tax for 1970. Although taxpayer's original return for 1970 listed gross business income ("gross receipts" or "gross sales" of line 1, schedule C, Form 1040, 1970 edition) as $36,107, this amount was readjusted during the Service audit to the figure of $48,506.99. (The latter figure is a total of some $20,006.99 in noncommissioned sales and $28,500 in receipts from the Rudin commission.) Defendant is, of course, entitled to challenge the figure in plaintiff's return and to use its own figure of $48,506.99. We adopt the latter, on these cross-motions for summary judgment, because taxpayer has not contested it, in oral or written argument in this court, and indeed has used it in his own brief to compute the tax on the erroneous net basis theory.

12. Plaintiff does not deny that he actually spent 67 days in the United States. Rather, his contention seems to be that the 67 days were spent in this country on gallery and public relations "business" (and some on family travel), not on his actual sculpture "work" which he performed solely in Italy. He seems to consider only his actual sculpturing to be important for our purposes, though his 67 days in this country were related to selling his art work, procuring commissions, and furthering his profession of sculpture.

Another factual assumption we make is that Mr. Cook spent 67 business days in the United States during 1970. That is what he stated in his return and in effect reaffirmed in his refund claim (as explained in part IV, *supra*). He now says that most, perhaps all, of those 67 days should not be counted as "work" days. This change in factual position from his refund claim is impermissible, for the reasons given in part IV, *supra*. Having claimed and reclaimed a deduction of business expenses for 67 days in the United States, he cannot now say that he spent a lesser number of days for the purposes of the present case.[12]

Given our factual assumptions, the computations set forth in Appendix A, *infra*, show that for 1970 taxpayer is entitled to no refund. In fact, he would owe the Government a small amount of money, but defendant has interposed no counterclaim. We add that, even if taxpayer is not precluded from varying the number of work or business days he spent in the United States in 1970, it would not affect the outcome for that year.[13]

13. Although taxpayer under his theory (no "work days" spent in the United States) would be able to claim the entire amount of his income as foreign source income, he could not exclude that income above the then-statutory maximum of $25,000. *See* I.R.C. § 911(c)(1)(B) (1970). Taxpayer is eligible to exclude the maximum amount even taking into account the 67 "business" days. This proposition is demonstrated as follows:

| Court's method | |
|---|---|
| 1) allocation of income between days in U.S. and days abroad: | |
| 67/240 × $48,506.99 = (U.S. source income) | $13,541.53 |
| 173/240 × $48,506.99 = (foreign source income) | $34,965.46 |
| 2) gross business income: | $48,506.99 |
| 3) gross business income less excludable foreign income (up to $25,000 maximum): | $48,506.99 ($25,000.00) |
| 4) gross includable business income: | $23,506.99 |

| Taxpayer's method | |
|---|---|
| 1) no allocation necessary, all days for working spent abroad: | |
| (foreign source income) | $48,506.99 |
| 2) gross business income: | $48,506.99 |
| 3) gross business income less excludable foreign income (up to $25,000 maximum): | $48,506.99 ($25,000.00) |
| 4) gross includable business income: | $23,506.99 |

## VI.

Our computation of taxpayer's liability for 1971 rests on two factual assumptions—that taxpayer's gross business income for 1971 was $27,772 and that the $12,250 taxpayer received in 1971 on the Rudin commission was for work done in 1970. Plaintiff's original return for 1971 listed $15,522 in noncommissioned sales, and $12,250 in commissioned receipts (*i. e.* the Rudin commission), for a total of $27,772. Plaintiff's refund claim for 1971 stated that this return "should have been accpted [sic] without adjustment." *See* note 10, *supra.* In his reply brief taxpayer now contends that the actual amount of commissioned receipts in 1971 was only $10,000, for a total gross business income of $25,522. This new factual contention is barred by the substantial variance rule, discussed in part IV, *supra.* Taxpayer is also bound to the factual assertion in his original return, reiterated in the refund claim, that the $12,250 received in 1971 for the Rudin sculpture was paid for services rendered in 1970. On that premise, section 911(c)(2) mandates that, in applying the $25,000 maximum income exclusion, " \* \* \* amounts received shall be considered received in the taxable year in which the services to which the amounts are attributable are performed." Because the taxpayer has already received the maximum statutory exclusion of $25,000 for 1970, *see* part V, *supra,* and appendix A, *infra,* he cannot exclude any of the $12,250 which is attributable to the 1970 tax year. *See* Treas.Reg. § 1.911–2(d)(1) (1971); Tax Guide for U.S. Citizens Abroad 11–12 (I.R.S. Public No. 54, 1971 ed.).

■ We do *not* assume that taxpayer is precluded from calculating his 1971 tax liability by excluding his noncommissioned receipts for that year as foreign-sourced income. Defendant strenuously contends that taxpayer cannot now exclude any of the 1971 noncommissioned sales because plaintiff did not exclude such receipts in his 1971 return, and his 1971 refund claim states that the original return should have

been accepted as filed. We reject this application of the substantial variance rule because taxpayer's refund claim did raise the issue of applying the section 911 income exclusion to noncommissioned sales. The first sentences of taxpayer's 1971 refund claim stated that the Service erred in not allowing an income exclusion for "all work" performed in Rome, and that that position should be reconsidered in light of *Tobey. See* note 10, *supra. Tobey* held, as we have pointed out, that that artist's noncommissioned sales were excludable as foreign income under section 911.60 T.C. 227 (1973). Thus a fair reading of taxpayer's refund claim is that taxpayer wanted the proceeds of all foreign work, including his noncommissioned work, to be excluded from his income.[14] This attempt to exclude noncommissioned sales, unlike the belated attempts to alter certain factual assumptions, is not a surprise or totally novel claim of which the Service was unaware. The Service's notice of disallowance of the refund claims states that the claim was denied because "[t]he Commissioner has not acquiesced in the Tax Court decision regarding Mark Tobey." Allowing taxpayer to raise the claim that his 1971 noncommissioned foreign income should have been excluded would not frustrate the purposes of the variance rule—to allow full administrative consideration of a taxpayer's claim. *See Union Pacific R.R. v. United States,* 389 F.2d 437, 442, 182 Ct.Cl. 103, 109 (1968).

With these assumptions, our computations for 1971, contained in appendix B, *infra,* reveal that taxpayer is entitled to a refund of only $40.46.

## VII.

There is still another theory, pressed by defendant, under which taxpayer could be denied recovery of even this $40.46. The Government observes that Mr. Cook used expensive bronze materials to produce his sculptures,[15] and concludes that the limitation on earned income contained in the second sentence of section 911(b), when capital is a "material income-producing factor", should be invoked.[16] We decline in this

14. Plaintiff made no trips to the United States in 1971.

15. Taxpayer's return for 1970 claimed some $16,000 in bronze-casting expenses and for 1971 claimed some $7,000 for the same purpose. Also, the record shows that, at plaintiff's request, Mr. Rudin paid (in 1971) $20,000 (out of the total price for the Rudin sculpture of $65,000) *directly to* the Italian foundry which cast that sculpture. Taxpayer's returns for

both years also reveal expenditures for wax, stone bases for sculptures, and shipping costs.

16. This sentence read:

"In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess

case—where only the relatively trivial sum of $40 + turns on this issue—to follow defendant into the uncertain waters of either trying ourselves to define when, if ever, an artist's materials are a material income-producing factor for the purposes of section 911, or of remanding for a trial on that issue before developing legal criteria applicable to this case. Exploring an unchartered sea for so small a potential catch is not a lightly-undertaken task, and here it is quite clear that defendant's theory does involve a novel area. We are aware of no case dealing with the foreign earned income exclusion by artists or other specially-skilled individuals which has analyzed whether a large investment in materials can be deemed a capital investment under 911(b). *Cf. Tobey v. Commissioner*, 60 T.C. 227, 231 (1973); [17] *Robida v. Commissioner*, 460 F.2d 1172 (9th Cir. 1970), *aff'g* 39 T.C.M. (P–H) ¶ 70,086 (1970). *But cf. Alexander v. Commissioner*, —— T.C.M. (P–H) ¶ 78,487 at 2019–20 (producer who leased camera equipment for films; held, capital was "material income-producing factor"). The regulations under section 911, a revenue ruling interpreting 911, and the Service's Tax Guide for U.S. Citizens Abroad all limit their examples of capital as a material income-producing factor to business enterprises such as retail merchants. *See* Treas. Reg. § 1.911–2(c)(3) (1971) ("In the case of a taxpayer engaged in a trade or business * * * " the capital as a material factor limitation shall apply); Rev.Rul. 75–86, 1975–1 Cum.Bull. 242, 243 (example number 3 describing "E," who "owned and operated * * * a retail store"); Tax Guide for U.S. Citizens Abroad 13 (I.R.S. Public. No. 54, 1971 ed.) (example number 2 describing an individual operating a business engaged "solely in selling merchandise outside the United States."); *cf.* Treas.Reg. § 1.1361–2(e)(2) (1971) (describing rules for tax election by unincorporated enterprise; "Capital is not a material income-producing factor where gross income of the enterprise consists principally of fees, commissions, or other compensation for personal services performed by the owners or employees of the enterprise.") Our present view is that, in view of defendant's argument, we should

know more about plaintiff's sculpture work and his basis for charging before deciding that the bronze was or was not a "material income-producing factor." That would demand a trial, with its effort, delay, and expense—all for $40.46. We therefore decline defendant's invitation to venture into this issue when the result could have such tiny practical impact in the instant case. In the context we consider the sum of $40.46 as *de minimis*.[18]

### Conclusion

On these grounds, the plaintiff's motion for summary judgment is denied as to 1970 and granted as to 1971 in the sum of $40.46. Defendant's motion for summary judgment is granted as to 1970 and denied (to the extent of $40.46) as to 1971. Judgment is entered for plaintiff in the sum of forty dollars and forty-six cents ($40.46), plus interest thereon as provided by law.

APPENDIX A: COMPUTATION OF 1970 TAXES

| Item | Amount |
|------|--------|
| 1) Gross business income ("Gross receipts or gross sales", line 1, schedule C, Form 1040): | $48,506.99 |
| 2) Excludable foreign income: | |

$$\frac{67 \text{ business days in U.S.}^1}{240 \text{ total business days}} \times \$48,506.99$$

$$= \$13,541.53 \text{ (U.S. source income)}^2$$

$$\$48,506.99 - \$13,541.53$$

$$= \$34,965.46 \text{ (foreign source income)}$$

Maximum excludable foreign income

$$= \$25,000.00$$

| | |
|------|--------|
| 3) Gross business income: | $48,506.99 |
| Less maximum excludable foreign income: | ($25,000.00) |
| | $23,506.99 |
| 4) Less business expenses attributable to included income:[3] | ($11,641.79) |
| Reportable business income (line 35, Form 1040; line 26 on Schedule C for Form 1040): | $11,865.20 |
| 5) Adjusted Gross income: | |
| —Reportable business income: | $11,865.20 |
| —Dividend income (line 13c, Form 1040): | $ 888.00 |

---

of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income." 26 U.S.C. § 911(b) (1970).

**17.** In *Tobey*—which involved paintings, pictures, and drawings, using relatively inexpensive materials—it was stipulated that capital

was not a material income-producing factor. 60 T.C. at 229.

**18.** If defendant feels that it should not have to pay this $40.46 (plus interest) without further proceedings on this issue, it may make that view known to the court in a motion for rehearing.

| Item | Amount |
|---|---|
| —Sale or exchange of property (Schedule D loss): | ($ 418.00) |
| —Trust Income: [4] | $ 0.00 |
| Adjusted gross income: | $12,335.20 |
| 6) Taxable income: | |
| —Less 4 exemptions: | ($ 2,500.00) |
| —Less standard deduction: | ($ 1,000.00) |
| Taxable income: | $ 8,835.20 |
| 7) Taxes: | |
| —Income tax: | $ 1,563.74 |
| —Self-employment tax: | $ 538.20 |
| —Surcharge: [5] | $ 39.00 |
| Total tax liability: | $ 2,140.94 |
| —Less tax per audit (already paid): | ($ 794.48) |
| Net tax liability: [6] | $ 1,346.46 |

[1] The allocation of 67/240 business days is based on taxpayer's own calculations contained in a supplementary schedule to Form 2555 in his 1970 return. As noted in the opinion, see note 13 and corresponding text, supra, even if one assumes (as taxpayer now argues) that no business days were spent in the United States, taxpayer still reaches the statutory maximum exclusion of $25,000.00.

[2] This allocation of the source of income for personal services is done pursuant to Treas.Reg. § 1.861–4(b); see Tax Guide for U.S. Citizens Abroad 12–13 (I.R.S. Public. No. 54, 1971 ed.); Rev.Rul. 69–238, 1969–1 Cum.Bull. 195; Hagerty v. Commissioner, 42 T.C.M. (P-H) ¶ 73,162 at 769 (1973).

[3] The $11,641.79 figure was calculated by computing the proportion of includable business income to gross business income times the total business expenses claimed by taxpayer in his return.

$$\frac{\$23,506.99 \text{ (includable business income)}}{\$48,506.99 \text{ (gross business income)}} \times \$24,023.00 = \$11,641.79$$

See Rev.Rul. 75–86, 1975–1 Cum.Bull. 242 (example number 1); Tax Guide for U.S. Citizens Abroad 16 (example 3) (I.R.S. Public. No. 54, 1971 ed.); Brewster v. Commissioner of Internal Revenue, 67 T.C. 352, 365 (1976), appeal docketed, No. 77–2010 (D.C. Cir. Nov. 14, 1977) (adopting similar formula); accord Alexander v. Commissioner,——T.C.M. (P-H) ¶ 78,487 at 2020 (1978); Quinn v. Commissioner, 43 T.C.M. (P-H) ¶ 74,064 (1974).

[4] The figures for dividend income, sale or exchange of property, and trust income are those found in taxpayer's return.

[5] I.R.C. §§ 1401–03 impose a tax on an individual's "self-employment income" defined in section 1402. In 1970, the self-employment tax for anyone with net earnings of $7,800 or greater was $538.20. See Treas.Reg. § 1.1401–1 (1971) (tax rate on self-employment income was 6.9 percent); Form 1040, Schedule SE, part III, line 7 (1970) reprinted in Research Institute of America, 1970 Individual Tax Return Guide 75.

In 1970 a surtax on the amount of income tax was also imposed, and the tax tables for joint returns with an income tax between $1,540 and $1,580 show a surtax of $39.00. See 1970 Tax Surcharge Table, reprinted in Research Institute of America, 1970 Individual Tax Return Guide 122.

[6] As stated in our opinion, the Government does not have a counter-claim for the $1,346.46 liability, and thus the figure of "Net tax liability" does not produce any actual tax liability for the taxpayer.

## APPENDIX B: COMPUTATION OF 1971 TAXES

| Item | Amount |
|---|---|
| 1) Gross business income: | $27,772.00 |
| 2) Excludable foreign income: [1] | $15,522.00 |
| 3) Gross business income: | $27,772.00 |
| Less excludable foreign income: | ($15,522.00) |
| | $12,250.00 |
| 4) Less business expenses attributable to included income: [2] | ($ 4,979.00) |
| Equals reportable business income: | $ 7,271.00 |
| 5) Adjusted gross income: | |
| —Reportable business income: | $ 7,271.00 |
| —Dividend income: | $ 984.00 |
| —Sale or exchange of property: | ($ 1,000.00) |
| —Trust income (line 37, Form 1040): [3] | $ 567.00 |
| Adjusted gross income: | $ 7,822.00 |
| 6) Taxable income: | $ 7,822.00 |
| 7) Taxes: | |
| —Income tax with 3 exemptions and standard deduction: [4] | $ 763.00 |
| —Self-employment tax: [5] | $ 545.32 |
| Total tax liability: | $ 1,308.32 |
| Tax per audit (already paid): | $ 1,348.78 |
| Net refund: | $ 40.46 |

[1] Plaintiff made no work-related trips to the United States in 1971, and thus no allocation of income between days worked in America and days worked abroad is necessary. The figure of $15,522, the total of all noncommissioned sales in 1971, is taken from plaintiff's tax return. It differs from defendant's figure of $15,522.61 by only $.61, an insignificant amount.

[2] The $4,979.00 figure is from taxpayer's 1971 return on a supplementary schedule for Form 2555. Taxpayer listed this figure as "expenses incurred on commission only," and thus the only business expenses which he can deduct are these expenses allocable to his included income. See I.R.C. § 911(a); Tax Guide for U.S. Citizens Abroad 16 (I.R.S. Public. No. 54, 1971 ed.).

[3] The dividend income, loss on sale or exchange of property, and trust income are taken from taxpayer's 1971 return.

[4] Although taxpayer in his 1971 return claimed four exemptions, the Service in the audit disallowed one of the exemptions. Taxpayer has not contested this disallowance before this court. The 1971 tax tables included the standard deduction and personal exemptions in the tax computation, and no separate figures are shown.

[5] The figure for the 1971 self-employment tax is derived by multiplying the applicable rate (7.5 percent) by taxpayer's net self-employment income ($7,271), his "reportable business income".

Before DAVIS, Judge, Presiding, and KASHIWA and KUNZIG, Judges.

On Defendant's Motion for Rehearing

This case comes before the court on defendant's motion for rehearing of the opinion and decision of April 18, 1979. Defendant's request that Part III of the opinion be reconsidered and its holding changed is denied. However, defendant's request with respect to Part VII of the opinion is grant-

ed (as foreshadowed in footnote 18 of the opinion), and instead of awarding plaintiff judgment of $40.46 (plus interest), that portion of the opinion is revised to hold that further factual proceedings are necessary before the court can decide whether the bronze in the sculptures was or was not a "material income-producing factor" under 26 U.S.C. § 911(b).

Accordingly, the conclusion of the opinion of April 18, 1979 is modified to provide that (a) plaintiff's motion for summary judgment is denied as to 1970, defendant's motion as to that year is granted, and the petition is dismissed as to 1970; and (b) as for 1971, plaintiff's and defendant's motions are granted and denied to the extent indicated in the opinion (as revised) and the case is remanded to the trial division for further proceedings on the issue discussed in Part VII of the opinion. If plaintiff does not wish to proceed further on that issue (in view of the small amount at stake), the petition will be dismissed as to 1971.

IT IS SO ORDERED.